JAMES SINGLETARY

1  looking at his arms.  I was looking at the gun that
2  he had right jamming me in the side of my head.
3        The braids come from when I was trying to
4  remember when him and Ben were away, was talking
5  outside the vehicle.  That's the only description
6  that I could possibly remember.  When he got in that
7  backseat from when he opened the door, I was not
8  paying attention to him when they were talking.
9        The first time I paid attention to him was when
10  he said, "Hey, give me all your money," and I turned
11  around and I got jammed in the side of the head with
12  the big gun.
13        That woke me up real quick, and that's all I
14  was focused on was not trying to get shot.
15  Q.     You were also not selling drugs, you are going
16  to get a Red Bull; is that correct?
17  A.     Correct.  And they searched me and I had no
18  drugs on me.
19        MR. KNIGHT:
20              Nothing further at this time.
21        THE COURT:
22              Redirect.
23        REDIRECT EXAMINATION BY MR. MURRAY:
24  Q.     When the officer was talking about identifying
25  marks, you said the braids.  Were you trying to
26  describe his hair close to his head, is that what you
27  were saying?
28  A.     What I thought then -- when I told him that
29  when I was talking about it on in my video is they'll
30  have little bitty things coming out the back of their
31  head; and that's what I thought I remember seeing.
32  Just when he pointed the gun at me, just looking,

309

JAMES SINGLETARY

1   looking at the gun, looking past him in a commotion
2   is, when I said it, I mean, when I said -- when I
3   made my statement to the police officer, and this had
4   just happened, I was shaking, I was nervous.
5           But when I was giving my video, and I told him,
6   I said he might have braids, that's what I thought I
7   remember seeing.  That's just what I thought it was,
8   was braids; but I wasn't meaning all this.
9   Q.      Not this but something you saw on his neck?
10  A.      Yes, sir.
11  Q.      Any question in your mind whether or not this
12  is the man that robbed you that day with a gun?
13  A.      No, sir, there is no question.  I know it was
14  him.
15          MR. MURRAY:
16                  That's all I have.
17          THE COURT:
18                  You may step down, sir.  Can the
19              witness be released from his subpoena?
20          MR. MURRAY:
21                  Yes, Your Honor.
22          THE COURT:
23                  Mr. Knight?
24          MR. KNIGHT:
25                  I'd ask for rebuttal after regarding
26              the testimony made by --
27          THE COURT:
28                  Make sure that you've got contact
29              information, you-all can reach him.
30          MR. MURRAY:
31                  We have some numbers.
32          THE COURT:

310

JAMES SINGLETARY

1            That's fine.  Sir, you are still
2       under the rule of sequestration, which
3       means that you're not to discuss your
4       testimony or this case with anyone other
5       than the lawyers.
6    THE WITNESS:
7            Yes, sir.
8    THE COURT:
9            All right.  And you are subject to
10      being recalled, it will be tomorrow.
11   THE WITNESS:
12           Sir, so be back up here tomorrow?
13   THE COURT:
14           You need to --
15   MR. MURRAY:
16           He's kind of -- his address
17      indicates he's kind of far away, so I'll
18      talk with him.  Don't leave yet.  I'll
19      talk with you when we break.
20   THE COURT:
21           You can go ahead and leave the
22      courtroom, but don't leave the courthouse.
23   THE WITNESS:
24           Yes, sir.
25   THE COURT:
26           Okay, let's stop.  We're not going
27      to gain a whole lot by continuing it at
28      this point.  So court's going to be at
29      recess until 9:30 in the morning.  We will
30      have some doughnuts and coffee for you, if
31      you'd like; so you can come for that at
32      about 9 o'clock.  If you'd rather get an

311

Chain
Né. H.7

```
 1              it was and the negative tone at that.
 2       MR. MURRAY:
 3              I believe, just so the record is
 4              exactly correct, I believe that was in
 5              jury selection.
 6       THE COURT:
 7              It was.
 8       MR. MURRAY:
 9              And Officer Spikes was not on the
10              jury that deliberated in this case.
11       THE COURT:
12              That is correct.
13       MR. KNIGHT:
14              Correct.
15       THE COURT:
16              The third basis says that a female
17              juror stated that she was familiar with
18              the victim.  Any further facts on that?
19       MR. KNIGHT:
20              I believe it was Juror No. 10, and I
21              think in the transcripts from jury
22              selection, she was on the jury.  It's
23              alleged by defendant that it's
24              insufficiency of counsel not to dismiss
25              that juror.  She stated she knew the
26              victim, can't remember his name off the
27              top of my head, said she knew him either
28              from work or through personal and social
29              matters.
30              And we'd argue that that is a
31              failure on my part as counsel and would
32              necessitate a new trial as well, Judge.
```

Exhibit       352

430

```
 1          THE COURT:
 2                  Mr. Murray.
 3          MR. MURRAY:
 4                  I don't specifically, I don't have
 5              my notes from jury selection here, I don't
 6              specifically remember her or whether this
 7              juror served on the jury.  I do believe
 8              that the juror indicated that it would,
 9              even though she had some knowledge of a
10              witness or a victim in the case, that it
11              would have no effect on her ability to
12              serve and be fair and impartial as a juror
13              in this case.
14          THE COURT:
15                  All right.
16          MR. MURRAY:
17                  Whether she served or didn't serve,
18              I don't remember that.
19          THE COURT:
20                  I don't have the specific name.  I
21              have the defendant's representation that
22              there was a juror that indicated that she
23              knew the victim and ended up serving on
24              the jury.  Again, without having specific
25              recollections, I know that it is my
26              practice when they acknowledge knowing any
27              of the participants in the trial that I
28              will follow-up with them to ensure that
29              they can still serve fairly and
30              impartially irrespective of that
31              knowledge.
32                  I do not believe that there was
```

431

```
 1        MR. PIERCE:

 2                I've seen him at the baseball field

 3            with the kids.

 4        MR. MURRAY:

 5                We would like to call Wendell

 6            O'Berry, possibly David Miller, possibly

 7            Charles McDaniel, James Singletary,

 8            possibly Tony Robertson.

 9        MR. KNIGHT:

10                Having heard that list, some of

11            which are police officers, some of which

12            are regular witnesses, does anyone know,

13            besides Captain Bullen -- yes, sir.

14        MR. PIERCE:

15                Wendell O'Berry, I went to school

16            with him.

17        MR. KNIGHT:

18                And you obviously probably know all

19            of them.

20        MR. SPIKES:

21                They are friends of mine.

22        MS. BROWN:

23                McDaniel?

24        MR. MURRAY:

25                Charles "Bubba" McDaniel.

26        MS. BROWN:

27                I know Bubba.

28        MS. MILLER:

29                I know David Miller and James

30            Singletary.

31        MR. KNIGHT:

32                Just knowing the person doesn't mean
```

71

Exhibit

149

```
 1                   ⊕        Acceptable.
 2        THE COURT:
 3                     To the defense.
 4                     We got nine.
 5        MR. KNIGHT:
 6                     Mr. Bell is fine.
 7        THE COURT:
 8                     Burkhalter, to the State.
 9        MR. MURRAY:
10                     State's going to excuse
11            Mr. Burkhalter.
12        THE COURT:
13                     That will be S3.
14                     Coley, to the State.
15        MR. MURRAY:
16                     Acceptable.
17        THE COURT:
18                     To the defense.
19        MR. KNIGHT:
20                     Excuse, Ms. Coley.
21        THE COURT:
22                     Miller, to the State.
23        MR. MURRAY:
24                     Acceptable.
25        THE COURT:
26                     To the defense.
27        MR. KNIGHT:
28                     Acceptable.
29        THE COURT:
30                     Creel, to the State.
31        MR. MURRAY:
32                     Acceptable.
```

Exhibit   88

1166

# BOGALUSA POLICE DEPARTMENT
# INCIDENT REPORT

DATE: 03/03/2016

## NUMBER: 2010011573

Page 6

Agency: BPD

Incident No: 2010011573

Author: O'BERRY, A/LT WENDELL

Title:   INITIAL REPORT

Report Type: I

INITIAL REPORT

ON TUESDAY, NOVEMBER 9TH, 2010, AT 1348 HOURS, THE BOGALUSA POLICE DEPARTMENT RECEIVED A 911 CALL FROM JAMES SINGLETARY, REPORTING THAT HE HAD BEEN ROBBED AT GUNPOINT.

REPORT BY: A/LT. WENDELL O'BERRY # 177

# BOGALUSA POLICE DEPARTMENT
# INCIDENT REPORT

DATE: 03/03/2016

## NUMBER: 2010011573

Page 7

Agency: BPD

Incident No: 2010011573

Author: O'BERRY, A/LT WENDELL

Title: OVERALL SUPPLEMENTAL REPORT

Report Type: S

OVERALL SUPPLEMENTAL REPORT

ON TUESDAY, NOVEMBER 9TH, 2010, AT APPROXIMATELY 1330 HOURS, A/LT. O'BERRY WAS ON PATROL, SOUTHBOUND ON AVENUE G. AT THE INTERSECTION OF AVENUE G AND WEST 7TH STREET, A MAROON PONTIAC ARRIVED AT THE STOP SIGN, GOING EAST ON WEST 7TH. A/LT. O'BERRY MOTIONED FOR THE VEHICLE TO PROCEED. WHEN THE CAR PASSED IN FRONT OF A/LT. O'BERRY, HE RECOGNIZED THE DRIVER AS WADE BENJAMIN INZINNA. ANOTHER WHITE MALE WAS IN THE FRONT PASSENGER SEAT. A/LT. O'BERRY PULLED IN BEHIND THE CAR, REQUESTED A REGISTRATION CHECK ON THE LICENSE PLATE, AND A WARRANTS CHECK ON INZINNA. INZINNA TURNED SOUTH ONTO AVENUE F, THEN IMMEDIATELY PULLED INTO A PARKING SPACE AND EXITED THE CAR. A/LT. O'BERRY CIRCLED THE BLOCK, AWAITING THE REQUESTED INFORMATION. THE CAR CAME BACK REGISTERED TO INZINNA'S GRANDMOTHER, DAISY KNIGHT. THERE WERE NO ACTIVE WARRANTS. A/LT. O'BERRY SAW THE CAR STILL PARKED, THEN RESUMED PATROL.

A SHORT TIME LATER, AT 1348 HOURS, THE BOGALUSA POLICE DEPARTMENT RECEIVED A 911 CALL FROM JAMES SINGLETARY, REPORTING THAT HE HAD BEEN ROBBED AT GUNPOINT AROUND AVENUE F. PFC. KEMP CALLED A/LT. O'BERRY, AND TOLD HIM ABOUT THE CALL. HE ADVISED THAT THE VICTIM HAD MENTIONED BEN AND THE MAROON CAR WHEN HE CALLED. DPY. DON MILEY WAS THEN FLAGGED DOWN BY THE VICTIM IN THE 700 BLOCK OF AVENUE F, AND REQUESTED AN OFFICER. A/LT. O'BERRY RESPONDED. A/LT. O'BERRY ALSO NOTIFIED OTHER UNITS TO BE ON THE LOOK OUT FOR INZINNA.

UPON ARRIVAL OFFICER SPOKE WITH SINGLETARY. HE STATED THAT HE HAD BEEN ROBBED BY TWO BLACK MALES, AND THEY LEFT IN A MAROON CAR DRIVEN BY A WHITE GUY NAMED BEN. A/LT. O'BERRY ASKED HIM IF IT WAS BEN INZINNA, AND HE STATED IT WAS. HE STATED THAT INZINNA HAD PICKED HIM UP ON AVENUE F AT WEST 8TH STREET, AND WAS GIVING HIM A RIDE. HE STATED THAT INZINNA THEN TURNED ONTO WEST 8TH STREET, THEN INTO AN ALLEY, AND THEY WERE FLAGGED DOWN BY TWO BLACK MALES. HE STATED THAT ONE OF THE MALES ASKED INZINNA ABOUT SOME JEANS. INZINNA GOT OUT AND WAS SHOWING THE SUBJECT SOME JEANS HE WAS SELLING. HE STATED THAT THE SUBJECT THEN ASKED INZINNA FOR A RIDE, AND HE DECLINED. SINGLETARY STATED THAT HE WAS ABOUT TO LEAVE AND ONE OF THE BLACK MALES PULLED A LARGE REVOLVER AND POINTED IT AT HIM, AND TOLD HIM TO GIVE IT UP. HE STATED THAT HE HAD $35.00 IN HIS POCKET AND HE GAVE IT TO THE SUBJECT. HE STATED THAT THE SUBJECT THREATENED TO KILL HIM AND, HIT HIM WITH THE GUN. HE STATED THAT THE SUBJECT WITH THE GUN THEN TOLD THE OTHER BLACK MALE TO SEARCH HIM. SINGLETARY STATED THAT HE KNOWS THE OTHER BLACK MALE AS TONY. HE STATED THAT TONY TOLD HIM TO GIVE HIM EVERYTHING, AND HE TOLD HIM HE HAD. TONY SEARCHED HIM, AND REMOVED EVERYTHING FROM HIS POCKETS. HE STATED THAT THE SUBJECT WITH THE GUN THEN TOLD HIM TO RUN. HE STARTED

# BOGALUSA POLICE DEPARTMENT
# INCIDENT REPORT

DATE: 03/03/2016                **NUMBER: 2010011573**                Page 8

RUNNING DOWN THE ALLEY, AND THE TWO BLACK MALES GOT IN THE CAR WITH BEN, AND DROVE AWAY.

WHILE SPEAKING WITH SINGLETARY, PFC. CASSARD ADVISED THAT HE HAD LOCATED INZINNA IN THE CAR AT JR. FOOD MART, 300 SUPERIOR AVENUE. A BLACK MALE NAMED TONY ROBERTSON WAS WITH HIM. A/LT. O'BERRY ADVISED HIM TO BRING INZINNA AND ROBERTSON IN FOR QUESTIONING, AND TOW THE CAR FOR INVESTIGATIVE PURPOSES. CARROLL'S WAS DISPATCHED FOR THE CAR. INZINNA AND ROBERTSON WERE DETAINED FOR QUESTIONING AND BROUGHT TO HEADQUARTERS. A/LT. O'BERRY TRANSPORTED SINGLETARY TO HEADQUARTERS.

UPON ARRIVAL A/LT. O'BERRY CONTACTED DET. BULLEN, AND REQUESTED HIS ASSISTANCE WITH THE INVESTIGATION. HE CAME TO HEADQUARTERS AND SINGLETARY TOLD HIM THE SAME STORY HE HAD RELATED TO A/LT. O'BERRY. OFFICERS THEN INTERVIEWED INZINNA. FIRST, A/LT. O'BERRY READ INZINNA HIS MIRANDA RIGHTS PER INTERROGATION FORM. HE READ THE WAIVER, SIGNED THE FORM, AND AGREED TO ANSWER QUESTIONS.

INZINNA TOLD OFFICERS THAT HE PICKED UP SINGLETARY ON WEST 7TH STREET, AND HE WAS SUPPOSED TO HAVE SOME ROXYCONTIN PILLS FOR SOMEONE THAT INZINNA KNEW. HE STATED THEY WERE FLAGGED DOWN IN THE ALLEY BETWEEN S & W AUTO SALES AND THE LAUNDRY MAT BY TONY AND ANOTHER BLACK MALE WHOSE NAME HE DIDN'T KNOW, WHO WANTED TO BUY SOME JEANS. WHILE HE WAS TALKING WITH THE UNKNOWN SUBJECT, HE STATED THE SUBJECT PRODUCED A HANDGUN AND ROBBED SINGLETARY. HE STATED THAT THE SUBJECT THEN MADE HIM GIVE HIM A RIDE DOWN THE ALLEY, GOT OUT, AND RAN AWAY. UPON FURTHER QUESTIONING IT WAS LEARNED THAT MUCH OF HIS STATEMENT WAS A LIE. HE EVENTUALLY ADMITTED THAT HE, TONY, AND THE OTHER SUBJECT, WERE GOING TO RIP OFF SINGLETARY FOR THE ROXYCONTIN AT THE LAUNDRY MAT. HE STATED THAT IT WAS HIS IDEA TO RIP HIM OFF, AND THE OTHER TWO WERE GOING TO DO THE RIP, MAKING IT LOOK LIKE INZINNA WASN'T INVOLVED. HE STATED THAT HE DIDN'T KNOW THE OTHER SUBJECT HAD A GUN, AND IT WASN'T SUPPOSED TO GET VIOLENT.

OFFICERS THEN QUESTIONED ROBERTSON. HE TOO WAS READ HIS MIRANDA RIGHTS PER INTERROGATION FORM. HE STATED IT WAS INZINNA'S IDEA TO RIP OFF SINGLETARY FOR THE DRUGS, AND INZINNA HAD ASKED HIM TO DO IT. HE STATED HE DECLINED, AND INZINNA PICKED UP THE OTHER SUBJECT IN BOGUE PROJECTS, AND HE WAS GOING TO DO THE RIP. HE STATED THAT HE DIDN'T KNOW THERE WAS GOING TO BE A GUN INVOLVED, AND THAT HE WAS JUST ALONG FOR THE RIDE. HE STATED THAT INZINNA DROPPED HIM AND THE OTHER SUBJECT OFF AT THE LAUNDRY MAT, THEN CALLED BACK AND SAID IT WAS OFF. HE STATED THEY WALKED TO THE ALLEY, AND INZINNA SHOWED UP WITH SINGLETARY. HE STATED THAT THE OTHER SUBJECT ROBBED SINGLETARY  T GUNPOINT. HE STATED HE DIDN'T SEARCH SINGLETARY, BUT TOLD HIM TO JUST GI' HIM (UNKNOWN SUBJECT) WHAT HE HAD. HE STATED THAT AFTER THE ROBBERY

# BOGALUSA POLICE DEPARTMENT
# INCIDENT REPORT

SINGLETARY RAN AWAY, AND THEY DROVE OFF IN THE CAR, DROPPING THE OTHER
SUBJECT OFF IN BOGUE PROJECTS.

ROBERTSON WAS BROUGHT TO THE DETECTIVE'S OFFICE FOR A VIDEO TAPED
INTERVIEW. DET. BULLEN AND A/LT. O'BERRY CONDUCTED THE INTERVIEW. HIS STORY
WAS SOMEWHAT THE SAME WITH SOME CHANGES. HE ATTEMPTED TO IMPLICATE
INZINNA AND THE OTHER SUBJECT, AND ACTED AS THOUGH HE WAS JUST ALONG FOR
THE RIDE, AND DIDN'T KNOW IT WAS GOING TO HAPPEN THAT WAY. SEE VIDEO.

OFFICERS THEN CONDUCTED A VIDEO TAPED INTERVIEW WITH SINGLETARY. HE
ADMITTED THAT INZINNA HAD CALLED HIM ABOUT GETTING SOME ROXYCONTIN, AND HE
TOLD HIM HE MAY COULD GET SOME. HE STATED THAT INZINNA PICKED HIM UP ON WEST
7TH STREET AND WAS SUPPOSED TO TAKE HIM TO THE TEXACO STORE, BUT WENT
DOWN THE ALLEY AND HE WAS ROBBED. SEE VIDEO.

OFFICERS THEN CONDUCTED A VIDEO TAPED INTERVIEW WITH INZINNA. HE STATED
THAT HE CALLED SINGLETARY TO GET THE PILLS, AND THE OTHER SUBJECT WAS GOING
TO RIP HIM OFF BY UNDER PAYING HIM FOR THE PILLS, BUT HE DIDN'T KNOW THERE
WOULD BE A GUN INVOLVED. HE CHANGED HIS STORY FROM THE FIRST INTERVIEW ON
SEVERAL THINGS. DURING THE INTERVIEW, INZINNA STATED THAT HE DIDN'T KNOW THE
UNKNOWN SUBJECTS NAME, BUT HE WAS LISTED IN HIS PHONE AS HOT BOY. INZINNA
ADMITTED HE HAD BOUGHT MARIJUANA FROM HIM OCCASIONALLY, AND HE LIVES IN
BOGUE PROJECTS. HE STATED THAT OFFICERS COULD GET HIS CELL PHONE FROM HIS
WIFE, AND LOOK UP THE NUMBER. SEE VIDEO.

ALSO SEE INVESTIGATIVE NARRATIVE BY DET. BULLEN FOR FURTHER ON THE
INTERVIEWS.

SINGLETARY WAS RELEASED AFTER THE INTERVIEWS. INZINNA AND ROBERTSON WERE
READ THEIR MIRANDA RIGHTS PER FORM, ADVISED THEY WERE BEING CHARGED WITH
ARMED ROBBERY AND ARMED ROBBERY WITH A GUN, AND TURNED OVER TO THE CITY
JAIL FOR BOOKING.

A/LT. O'BERRY AND DET. BULLEN LOCATED INZINNA'S WIFE AND TOOK POSSESSION OF
INZINNA'S CELL PHONE AS EVIDENCE. HOT BOY WAS LISTED IN THE CELL PHONE. DET.
BULLEN ALSO LEARNED FROM INZINNA'S WIFE THAT HOT BOY WAS ALSO KNOWN AS
MUTHER. DET. BULLEN AGAIN QUESTIONED INZINNA ABOUT THE SUBJECT'S IDENTITY,
AND HE ALSO STATED HE WAS KNOWN AS MUTHER. HE ALSO STATED THAT HE PICKED
UP THE SUBJECT FROM A BLUE HOUSE NEAR THE SOUTH END OF ELLIOT STREET IN
BOGUE PROJECTS.

A/LT. O'BERRY AND DET. BULLEN LOCATED THE HOUSE ON ELLIOT STREET. THERE WERE
NO NUMBERS, BUT BASED ON THE NEARBY HOUSES, IT WAS DETERMINED THAT THE
ADDRESS SHOULD BE 54 SOMETHING.

# BOGALUSA POLICE DEPARTMENT
## INCIDENT REPORT

DATE: 03/03/2016        **NUMBER: 2010011573**        Page  10

OFFICERS ALSO CHECKED THE ALIAS SECTION OF THE POLICE COMPUTER SYSTEM, AND LOCATED A MUTHER AND MOOTHER, LISTED AS AN ALIAS FOR HAROLD JOHNSON BUNCH. HIS MOTHER WAS LISTED AS LORETTA BUNCH, AND SHE WAS IN THE SYSTEM WITH AN ADDRESS OF 542 ELLIOT STREET. MUG SHOTS OF BUNCH WERE SHOWN TO INZINNA AND ROBERTSON. THEY BOTH POSITIVELY IDENTIFIED HAROLD JOHNSON BUNCH AS THEIR ACCOMPLICE IN THE ROBBERY.

ARREST WARRANTS WILL BE SOUGHT FOR HAROLD JOHNSON BUNCH FOR ARMED ROBBERY AND ARMED ROBBERY WITH A GUN.

SEE INVESTIGATIVE NARRATIVE AND VIDEO TAPED INTERVIEWS FOR FURTHER INFORMATION.

REPORT BY: A/LT. WENDELL O'BERRY # 177

# BOGALUSA POLICE DEPARTMENT
## INCIDENT REPORT
### NUMBER: 2010011573

Page G

DATE: 11/15/2010

Agency: BPD

Incident No: 2010011573

Author: O'BERRY, A/LT WENDELL
Title: OVERALL SUPPLEMENTAL REPORT

Report Type: S

OVERALL SUPPLEMENTAL REPORT

ON TUESDAY, NOVEMBER 9TH, 2010, AT APPROXIMATELY 1330 HOURS, A/LT. O'BERRY WAS ON PATROL, SOUTHBOUND ON AVENUE G. AT THE INTERSECTION OF AVENUE G AND WEST 7TH STREET, A MAROON PONTIAC ARRIVED AT THE STOP SIGN, GOING EAST ON WEST 7TH. A/LT. O'BERRY MOTIONED FOR THE VEHICLE TO PROCEED. WHEN THE CAR PASSED IN FRONT OF A/LT. O'BERRY, HE RECOGNIZED THE DRIVER AS WADE BENJAMIN INZINNA. ANOTHER WHITE MALE WAS IN THE FRONT PASSENGER SEAT. A/LT. O'BERRY PULLED IN BEHIND THE CAR, REQUESTED A REGISTRATION CHECK ON THE LICENSE PLATE, AND A WARRANTS CHECK ON INZINNA. INZINNA TURNED SOUTH ONTO AVENUE F, THEN IMMEDIATELY PULLED INTO A PARKING SPACE AND EXITED THE CAR. A/LT. O'BERRY CIRCLED THE BLOCK, AWAITING THE REQUESTED INFORMATION. THE CAR CAME BACK REGISTERED TO INZINNA'S GRANDMOTHER, DAISY KNIGHT. THERE WERE NO ACTIVE WARRANTS. A/LT. O'BERRY SAW THE CAR STILL PARKED, THEN RESUMED PATROL.

A SHORT TIME LATER, AT 1348 HOURS, THE BOGALUSA POLICE DEPARTMENT RECEIVED A 911 CALL FROM JAMES SINGLETARY, REPORTING THAT HE HAD BEEN ROBBED AT GUNPOINT AROUND AVENUE F. PFC. KEMP CALLED A/LT. O'BERRY, AND TOLD HIM ABOUT THE CALL. HE ADVISED THAT THE VICTIM HAD MENTIONED BEN AND THE MAROON CAR WHEN HE CALLED. DPY. DON MILEY WAS THEN FLAGGED DOWN BY THE VICTIM IN THE 700 BLOCK OF AVENUE F, AND REQUESTED AN OFFICER. A/LT. O'BERRY RESPONDED. A/LT. O'BERRY ALSO NOTIFIED OTHER UNITS TO BE ON THE LOOK OUT FOR INZINNA.

UPON ARRIVAL OFFICER SPOKE WITH SINGLETARY. HE STATED THAT HE HAD BEEN ROBBED BY TWO BLACK MALES, AND THEY LEFT IN A MAROON CAR DRIVEN BY A WHITE GUY NAMED BEN. A/LT. O'BERRY ASKED HIM IF IT WAS BEN INZINNA, AND HE STATED IT WAS. HE STATED THAT INZINNA HAD PICKED HIM UP ON AVENUE F AT WEST 5TH STREET, AND WAS GIVING HIM A RIDE. HE STATED THAT INZINNA THEN TURNED ONTO WEST 8TH STREET, THEN INTO AN ALLEY, AND THEY WERE FLAGGED DOWN BY TWO BLACK MALES. HE STATED THAT ONE OF THE MALES ASKED INZINNA ABOUT SOME JEANS. INZINNA GOT OUT AND WAS SHOWING THE SUBJECT SOME JEANS HE WAS SELLING. HE STATED THAT THE SUBJECT THEN ASKED INZINNA FOR A RIDE, AND HE DECLINED. SINGLETARY STATED THAT HE WAS ABOUT TO LEAVE AND ONE OF THE BLACK MALES PULLED A LARGE REVOLVER AND POINTED IT AT HIM, AND TOLD HIM TO GIVE IT UP. HE STATED THAT HE HAD $35.00 IN HIS POCKET AND HE GAVE IT TO THE SUBJECT. HE STATED THAT THE SUBJECT THREATENED TO KILL HIM AND, HIT HIM WITH THE GUN. HE STATED THAT THE SUBJECT WITH THE GUN THEN TOLD THE OTHER BLACK MALE TO SEARCH HIM. SINGLETARY STATED THAT HE KNOWS THE OTHER BLACK MALE AS TONY. HE STATED THAT TONY TOLD HIM TO GIVE HIM EVERYTHING, AND HE TOLD HIM HE HAD. TONY SEARCHED HIM, AND REMOVED EVERYTHING FROM HIS POCKETS. HE STATED THAT THE SUBJECT WITH THE GUN THEN TOLD HIM TO RUN. HE STARTED

# BOGALUSA POLICE DEPARTMENT
## INCIDENT REPORT

DATE: 11/15/2010

### NUMBER: 2010011573

Page 7

RUNNING DOWN THE ALLEY, AND THE TWO BLACK MALES GOT IN THE CAR WITH BEN, AND DROVE AWAY.

WHILE SPEAKING WITH SINGLETARY, PFC. CASSARD ADVISED THAT HE HAD LOCATED INZINNA IN THE CAR AT JR. FOOD MART, 300 SUPERIOR AVENUE. A BLACK MALE NAMED TONY ROBERTSON WAS WITH HIM. A/LT. O'BERRY ADVISED HIM TO BRING INZINNA AND ROBERTSON IN FOR QUESTIONING, AND TOW THE CAR FOR INVESTIGATIVE PURPOSES. CARROLL'S WAS DISPATCHED FOR THE CAR. INZINNA AND ROBERTSON WERE DETAINED FOR QUESTIONING AND BROUGHT TO HEADQUARTERS. A/LT. O'BERRY TRANSPORTED SINGLETARY TO HEADQUARTERS.

UPON ARRIVAL A/LT. O'BERRY CONTACTED DET. BULLEN, AND REQUESTED HIS ASSISTANCE WITH THE INVESTIGATION. HE CAME TO HEADQUARTERS AND SINGLETARY TOLD HIM THE SAME STORY HE HAD RELATED TO A/LT. O'BERRY. OFFICERS THEN INTERVIEWED INZINNA. FIRST, A/LT. O'BERRY READ INZINNA HIS MIRANDA RIGHTS PER INTERROGATION FORM. HE READ THE WAIVER, SIGNED THE FORM, AND AGREED TO ANSWER QUESTIONS.

INZINNA TOLD OFFICERS THAT HE PICKED UP SINGLETARY ON WEST 7TH STREET, AND HE WAS SUPPOSED TO HAVE SOME ROXYCONTIN PILLS FOR SOMEONE THAT INZINNA KNEW. HE STATED THEY WERE FLAGGED DOWN IN THE ALLEY BETWEEN S & W AUTO SALES AND THE LAUNDRY MAT BY TONY AND ANOTHER BLACK MALE WHOSE NAME HE DIDN'T KNOW, WHO WANTED TO BUY SOME JEANS. WHILE HE WAS TALKING WITH THE UNKNOWN SUBJECT, HE STATED THE SUBJECT PRODUCED A HANDGUN AND ROBBED SINGLETARY. HE STATED THAT THE SUBJECT THEN MADE HIM GIVE HIM A RIDE DOWN THE ALLEY, GOT OUT, AND RAN AWAY. UPON FURTHER QUESTIONING IT WAS LEARNED THAT MUCH OF HIS STATEMENT WAS A LIE. HE EVENTUALLY ADMITTED THAT HE, TONY, AND THE OTHER SUBJECT, WERE GOING TO RIP OFF SINGLETARY FOR THE ROXYCONTIN AT THE LAUNDRY MAT. HE STATED THAT IT WAS HIS IDEA TO RIP HIM OFF, AND THE OTHER TWO WERE GOING TO DO THE RIP, MAKING IT LOOK LIKE INZINNA WASN'T INVOLVED. HE STATED THAT HE DIDN'T KNOW THE OTHER SUBJECT HAD A GUN, AND IT WASN'T SUPPOSED TO GET VIOLENT.

OFFICERS THEN QUESTIONED ROBERTSON. HE TOO WAS READ HIS MIRANDA RIGHTS PER INTERROGATION FORM. HE STATED IT WAS INZINNA'S IDEA TO RIP OFF SINGLETARY FOR THE DRUGS, AND INZINNA HAD ASKED HIM TO DO IT. HE STATED HE DECLINED, AND INZINNA PICKED UP THE OTHER SUBJECT IN BOGUE PROJECTS, AND HE WAS GOING TO DO THE RIP. HE STATED THAT HE DIDN'T KNOW THERE WAS GOING TO BE A GUN INVOLVED, AND THAT HE WAS JUST ALONG FOR THE RIDE. HE STATED THAT INZINNA DROPPED HIM AND THE OTHER SUBJECT OFF AT THE LAUNDRY MAT, THEN CALLED BACK AND SAID IT WAS OFF. HE STATED THEY WALKED TO THE ALLEY, AND INZINNA SHOWED UP WITH SINGLETARY. HE STATED THAT THE OTHER SUBJECT ROBBED SINGLETARY AT GUNPOINT. HE STATED HE DIDN'T SEARCH SINGLETARY, BUT TOLD HIM TO JUST GIVE HIM (UNKNOWN SUBJECT) WHAT HE HAD. HE STATED THAT AFTER THE ROBBERY,

# BOGALUSA POLICE DEPARTMENT
## INCIDENT REPORT

DATE: 11/15/2010                    **NUMBER: 2010011573**                    Page 8

SINGLETARY RAN AWAY, AND THEY DROVE OFF IN THE CAR, DROPPING THE OTHER
SUBJECT OFF IN BOGUE PROJECTS.

ROBERTSON WAS BROUGHT TO THE DETECTIVE'S OFFICE FOR A VIDEO TAPED
INTERVIEW. DET. BULLEN AND A/LT. O'BERRY CONDUCTED THE INTERVIEW. HIS STORY
WAS SOMEWHAT THE SAME WITH SOME CHANGES. HE ATTEMPTED TO IMPLICATE
INZINNA AND THE OTHER SUBJECT, AND ACTED AS THOUGH HE WAS JUST ALONG FOR
THE RIDE, AND DIDN'T KNOW IT WAS GOING TO HAPPEN THAT WAY. SEE VIDEO.

OFFICERS THEN CONDUCTED A VIDEO TAPED INTERVIEW WITH SINGLETARY. HE
ADMITTED THAT INZINNA HAD CALLED HIM ABOUT GETTING SOME ROXYCONTIN, AND HE
TOLD HIM HE MAY COULD GET SOME. HE STATED THAT INZINNA PICKED HIM UP ON WEST
7TH STREET AND WAS SUPPOSED TO TAKE HIM TO THE TEXACO STORE, BUT WENT
DOWN THE ALLEY AND HE WAS ROBBED. SEE VIDEO.

OFFICERS THEN CONDUCTED A VIDEO TAPED INTERVIEW WITH INZINNA. HE STATED
THAT HE CALLED SINGLETARY TO GET THE PILLS, AND THE OTHER SUBJECT WAS GOING
TO RIP HIM OFF BY UNDER PAYING HIM FOR THE PILLS, BUT HE DIDN'T KNOW THERE
WOULD BE A GUN INVOLVED. HE CHANGED HIS STORY FROM THE FIRST INTERVIEW ON
SEVERAL THINGS. DURING THE INTERVIEW, INZINNA STATED THAT HE DIDN'T KNOW THE
UNKNOWN SUBJECTS NAME, BUT HE WAS LISTED IN HIS PHONE AS HOT BOY. INZINNA
ADMITTED HE HAD BOUGHT MARIJUANA FROM HIM OCCASIONALLY, AND HE LIVES IN
BOGUE PROJECTS. HE STATED THAT OFFICERS COULD GET HIS CELL PHONE FROM HIS
WIFE, AND LOOK UP THE NUMBER. SEE VIDEO.

ALSO SEE INVESTIGATIVE NARRATIVE BY DET. BULLEN FOR FURTHER ON THE
INTERVIEWS.

SINGLETARY WAS RELEASED AFTER THE INTERVIEWS. INZINNA AND ROBERTSON WERE
READ THEIR MIRANDA RIGHTS PER FORM, ADVISED THEY WERE BEING CHARGED WITH
ARMED ROBBERY AND ARMED ROBBERY WITH A GUN, AND TURNED OVER TO THE CITY
JAIL FOR BOOKING.

A/LT. O'BERRY AND DET. BULLEN LOCATED INZINNA'S WIFE AND TOOK POSSESSION OF
INZINNA'S CELL PHONE AS EVIDENCE. HOT BOY WAS LISTED IN THE CELL PHONE. DET.
BULLEN ALSO LEARNED FROM INZINNA'S WIFE THAT HOT BOY WAS ALSO KNOWN AS
MUTHER. DET. BULLEN AGAIN QUESTIONED INZINNA ABOUT THE SUBJECT'S IDENTITY,
AND HE ALSO STATED HE WAS KNOWN AS MUTHER. HE ALSO STATED THAT HE PICKED
UP THE SUBJECT FROM A BLUE HOUSE NEAR THE SOUTH END OF ELLIOT STREET IN
BOGUE PROJECTS.

A/LT. O'BERRY AND DET. BULLEN AND LOCATED THE HOUSE ON ELLIOT STREET. THERE
WERE NO NUMBERS, BUT BASED ON THE NEARBY HOUSES, IT WAS DETERMINED THAT
THE ADDRESS SHOULD BE 54 SOMETHING.

- what number
- where's cell phone
  2nd statement from Inzinna

# BOGALUSA POLICE DEPARTMENT
## INCIDENT REPORT
### NUMBER: 2010011573

Page 9

DATE: 11/15/2010

OFFICERS ALSO CHECKED THE ALIAS SECTION OF THE POLICE COMPUTER SYSTEM, AND LOCATED A MUTHER AND MOOTHER, LISTED AS AN ALIAS FOR HAROLD JOHNSON BUNCH. HIS MOTHER WAS LISTED AS LORETTA BUNCH, AND SHE WAS IN THE SYSTEM WITH AN ADDRESS OF 542 ELLIOT STREET. MUG SHOTS OF BUNCH WERE SHOWN TO INZINNA AND ROBERTSON. THEY BOTH POSITIVELY IDENTIFIED HAROLD JOHNSON BUNCH AS THEIR ACCOMPLICE IN THE ROBBERY.

ARREST WARRANTS WILL BE SOUGHT FOR HAROLD JOHNSON BUNCH FOR ARMED ROBBERY AND ARMED ROBBERY WITH A GUN.

SEE INVESTIGATIVE NARRATIVE AND VIDEO TAPED INTERVIEWS FOR FURTHER INFORMATION.

REPORT BY: A/LT. WENDELL O'BERRY # 177

Alias?
H. J. B. v. H. B.

# BOGALUSA POLICE DEPARTMENT
## INCIDENT REPORT

DATE: 11/15/2010                        **NUMBER: 2010011573**                        Page 5

Agency: BPD                     Author: O'BERRY, A/LT WENDELL
Incident No: 2010011573           Title:  INITIAL REPORT                        Report Type: I

INITIAL REPORT

ON TUESDAY, NOVEMBER 9TH, 2010, AT 1348 HOURS, THE BOGALUSA POLICE
DEPARTMENT RECEIVED A 911 CALL FROM JAMES SINGLETARY, REPORTING THAT HE
HAD BEEN ROBBED AT GUNPOINT.

REPORT BY: A/LT. WENDELL O'BERRY # 177

BOGALUSA POLICE
Lineup Date/Time: 11/10/10 8:51

Page: 2



4

5

6

Exhibit

## BOGALUSA POLICE
Lineup Date/Time:  11/10/10   8:51

Page:      1



1



2



3

## Identification Information

Print Date: 01/04/11          ID Number: 2000090441          Entry Date: 1/03/2011

 

| Last Name: | First Name, MI: | Suffix: | | |
|---|---|---|---|---|
| BUNCH | HAROLD  *Johnson* | | OLN/State: | SSN: 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 |

Address:                                        Type:
542 ELLIOT ST                                   I

BOGALUSA          LA  704270000

Home Telephone: Business Telephone: Other Telephone:
(985) 000-0000  (504) 000-0000   (504) 000-0000

E Mail:

| Date Of Birth: | Race: | Sex: | Height: | Weight: |
|---|---|---|---|---|
| 5/07/1985 | B | M | 5-11 | 156 |

Appearance: NORMAL                          Hair Color: BLACK
    Build: THIN                              Hair Length: SHORT
Complexion: DARK                             Hair Style: AFRO
Dangerous?: Y                                     Marks: TATTOO
  If Y, How?: ARMED AND DANGEROUS                     MO: NARCOTIC USER/SELLER
   Ethnicity: NOT OF HISPANIC ORIGIN              Speech: NORMAL
  Eye Color: BROWN                                  Talk: NORMAL
Eye Defects: NONE                                  Teeth: DESIGNER
       Facial: CLEAN SHAVEN

## BOGALUSA POLICE
Lineup Date/Time: 11/10/10   8:51

Page:      3

**1**   Name: MILLER, DAVID BERNARD                ID Number: 1999050169
Race: B          Sex: M          DOB: 12/15/1984   Height: 5- 8    Weight: 160   Soc. Sec. Num.: 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
Appearance: NORML   Build: MED    Complexion: DARK   Ethnicity: N    Eyes: BROWN Eye Defects: NONE
Facial: MUST    Hair: BLACK   Hair Length: SHORT   Hair Style: AFRO    Marks: TATTO    Resident: R
Speech: NORML  Talk: NORML    Teeth: NORML   M.O.: F               OLN: 010040391

**2**   Name: FORBES, QUINCEY ONEAL                ID Number: 1999070089
Race: B          Sex: M          DOB: 12/31/1984   Height: 5- 4    Weight: 155   Soc. Sec. Num.: 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
Appearance: NORML   Build: THIN    Complexion: DARK   Ethnicity: N    Eyes: BROWN Eye Defects: NONE
Facial: MUST    Hair: BLACK   Hair Length: LONG   Hair Style: BRAID    Marks: TATTO    Resident: R
Speech: NORML  Talk: NORML    Teeth: NORML   M.O.: N               OLN: 90187062

**3**   Name: MILLER, LAFELIX DISHON                ID Number: 1999080372
Race: B          Sex: M          DOB: 4/13/1982   Height: 5-11    Weight: 175   Soc. Sec. Num.: 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
Appearance: NORML   Build: MED    Complexion: MED   Ethnicity: N    Eyes: BROWN Eye Defects: NONE
Facial: MUST    Hair: BLACK   Hair Length: SHORT   Hair Style: AFRO    Marks: TATTO    Resident: R
Speech: NORML  Talk: NORML    Teeth: NORML   M.O.: N               OLN:

## BOGALUSA POLICE
Lineup Date/Time:  11/10/10   8:51

Page:        4

---

**4**      Name:  JEFFERSON, CRAIG ANTWON                          ID Number: 2000020227

Race: B              Sex: M          DOB: 10/14/1986    Height: 6- 0    Weight: 165    Soc. Sec. Num.: 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

Appearance: NORML   Build: MED     Complexion: DARK    Ethnicity: N    Eyes: BROWN  Eye Defects: NONE

Facial: CLEAN      Hair: BLACK     Hair Length: SHORT    Hair Style: STRAT      Marks: TATTO    Resident: R

Speech: NORML   Talk: NORML      Teeth: NORML   M.O.: N                      OLN: 8713503

---

**5**      Name:  BUNCH, HAROLD JOHNSON                            ID Number: 2000090441

Race: B              Sex: M          DOB: 5/07/1985    Height: 5-11    Weight: 156    Soc. Sec. Num.: 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

Appearance: NORML   Build: THIN     Complexion: DARK    Ethnicity: N    Eyes: BROWN  Eye Defects: NONE

Facial: CLEAN      Hair: BLACK     Hair Length: SHORT    Hair Style: AFRO      Marks: TATTO    Resident: R

Speech: NORML   Talk: NORML      Teeth: DESIG   M.O.: N                      OLN:

---

**6**      Name:  MORRIS, DEVVERRON TYSHON                         ID Number: 2001070235

Race: B              Sex: M          DOB: 4/21/1983    Height: 6- 1    Weight: 165    Soc. Sec. Num.: 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

Appearance: NORML   Build: MED     Complexion: DARK    Ethnicity: N    Eyes: BROWN  Eye Defects: NONE

Facial: GOATE      Hair: BLACK     Hair Length: SHORT    Hair Style: AFRO      Marks: TATTO    Resident: R

Speech: NORML   Talk: NORML      Teeth: DESIG   M.O.: N                      OLN: 9338873

---

BOGALUSA POLICE DEPARTMENT
LINE-UP IDENTIFICATION FORM
BOGALUSA, LOUISIANA  70427

DATE: _11-11-10_

TIME: _12:58 pm_

PLACE: _214 Arkansas Ave._

YOU ARE TO VIEW THE PHOTOGRAPHIC LINE-UP WHICH IS A
SET OF MIXED PHOTOS THAT ARE NUMBERED ONE THROUGH
SIX.  SHOULD YOU RECOGNIZE A SUSPECT IN THE LINE-UP,
PLEASE PLACE YOUR INITIALS, DATE, AND TIME, NEXT TO THE
PHOTO IN THE SPACE PROVIDED.  ALSO, PLEASE CIRCLE THE
CORRESPONDING NUMBER WHICH IS LISTED BELOW ON THIS
FORM.  SHOULD YOU HAVE ANY REMARKS, PLEASE WRITE
THEM ON THE BOTTOM OF THIS FORM IN THE SPACE PROVIDED.
IF MORE SPACE IS NEEDED, THE BACK OF THIS FORM MAY ALSO
BE USED.

1.          2.          3.          4.          5.          6.

PLEASE SIGN YOUR NAME BELOW:

_James D. Singletary_

WITNESSING OFFICERS:
_____  #89
NAME, RANK, AND BADGE NUMBER

_____
NAME, RANK, AND BADGE NUMBER

REMARKS:

STATE OF LOUISIANA                    22ND JUDICIAL DISTRICT
VS.   11-CR8-111246                   PARISH OF WASHINGTON
      09-CR8-102336                   STATE OF LOUISIANA
      HAROLD BUNCH

### COMMITMENT

To:  Robert Crowe, Sheriff of the Parish of Washington, to the keeper of the Louisiana State Penitentiary ------- Greetings:

Whereas, by a decree of the Honorable Twenty-Second Judicial District Court of the State of Louisiana, in and for the Parish of Washington, **HAROLD BUNCH**, has been adjudicated guilty of **111246, MULTIPLE OFFENDER BILL, 102336, SIMPLE BURGLARY**, and sentenced by said Court to imprisonment at Hard Labor for the term of **#111246, THIRTY-FIVE (35) YEARS HARD LABOR WITHOUT BENEFIT, #102336, TWELVE (12) YEARS HARD LABOR.  SENTENCES ARE TO RUN CONCURRENT WITH EACH OTHER AND ANY/ALL SENTENCES NOW BEING SERVED AND DEFENDANT IS GIVEN CREDIT FOR ANY TIME SERVED SUBSEQUENT TO ARREST.**

You are therefore hereby commanded to convey the said **HAROLD BUNCH** to the State Penitentiary at Angola, Louisiana and there Deliver **HAROLD BUNCH** with this warrant, to the keeper of said Penitentiary, who is hereby authorized and commanded to receive and keep **HAROLD BUNCH** in safe custody for **111246, MULTIPLE OFFENDER BILL, 102336, SIMPLE BURGLARY, and** during said term for and sentenced by said Court to imprisonment at Hard Labor for the term of **#111246, THIRTY-FIVE (35) YEARS HARD LABOR WITHOUT BENEFIT, #102336, TWELVE (12) YEARS HARD LABOR.  SENTENCES ARE TO RUN CONCURRENT WITH EACH OTHER AND ANY/ALL SENTENCES NOW BEING SERVED AND DEFENDANT IS GIVEN CREDIT FOR ANY TIME SERVED SUBSEQUENT TO ARREST.**

And this shall be yours and his warrant for so doing.

Witness the Honorable Will Crain
Judge of our said Court, my official
Signature and seal of office at
Franklinton, Louisiana this the
22ND day of NOVEMBER, 2011.

_Lorrie Price_
Lorrie Price, Deputy Clerk

A True Copy of Original
This____11-22-11____
____S. Price____
By. Clerk of Court

HAROLD BUNCH 00586582 LSP Housing: J CUDA 4/R  ID:218500628  [P 5/5]

You have received a *jpay* letter, the fastest way to get mail

From : Carla M Sanderson, CustomerID: 15051146
To   : HAROLD BUNCH, ID: 00586582
Date : 7/6/2016 3:33:02 PM EST,   Letter ID: 218500628
Location : LSP
Housing   J CUDA 4/R

gone and the car was going down the alley .  I know tony didn't break out and run. Tony jumped in the car.

WB: the time is now 3:55pm November 9, 2010 this will conclude the statement from james singletary

HAROLD BUNCH 00586582 LSP Housing: J CUDA 4/R ID:218500628 [P 5/5]

You have received a **jpay** letter, the fastest way to get mail

From : Carla M Sanderson, CustomerID: 15051146
To   : HAROLD BUNCH, ID: 00586582
Date : 7/6/2016 3:33:02 PM EST.   Letter ID: 218500628
Location : LSP
Housing : J CUDA 4/R

gone and the car was going down the alley . I know tony didn't break out and run. Tony jumped in the car.

WB: the time is now 3:55pm November 9, 2010 this will conclude the statement from james singletary

HAROLD BUNCH 00586582 LSP Housing: J CUDA 4/R  ID:218500628  [P 1/5]

*You have received a jpay letter, the fastest way to get mail*

From : Carla M Sanderson,  CustomerID: 15051146
To   : HAROLD BUNCH, ID: 00586582
Date : 7/6/2016 3:33:02 PM EST,    Letter ID: 218500628
Location : LSP
Housing : J CUDA 4/R

Hey Hey Harold!!!

I hope you're doing well. Just wanted to drop you a line because we haven't spoken in a minute. I added more money to my phone account so you can call me again. Things are good with me, andrew and i finished our trial and i have some down time but am still busy. This Thursday I am going to a baseball game with my Pop Pop! Also, he is turning 90 years old this month and we are having a big bday party for him July 24.

Also I am dating someone new. She's 24!! Super cute and smart. Her name is Morgan :) So far so good but it's very new.

Other than that just working and holding down the forte. I need to plan my trip to Louisiana for October soon.

I got your draft affidavits but have to make some changes and I will explain more over the phone. I also transcribed the video of james and have included it below.

I hope you're doing well and out of lockdown!!! Talk soon my friend!


KB: Today's date is November the 9, 2010 the time is now 3:42pm.My name is captain Kendell Bullen with the Bogalusa Police Department, Detective Division. Also present is Lt. O'Berry Bogalusa Police department and James Singletary. James what's your date of birth?

JS: 1/10/90

KB: The reason for this interview today is the Bogalusa police department received a call from james right after being robbed. Off avenue F in the pleasant hill area. James why don't you tell me what happened ? What took place with the robbery.

JS: I was sittin around my house. I was about to go out to the Texaco to get me a redbull when ben called me.

KB: Who is ben?

JS: ben is just a character around the neighborhood.  I know of him and I talked to him before, several times, not like a best friend, but a guy around a neighborhood. You know a bunch of people stay around the neighborhood

JS: he asked me if I can get my hands on anything as far as drugs wise and I told him ben I might be able to get my hands on something but to I need to go to the Texaco because I needed to go to the Texaco and I told him I could get something when I got up there and well we left the house and started going up to the Texaco

KB: when you say we left the house what do you mean

JS: he come over to pick me up from the place I was at.

KB: Ben comes to pick you up?

JS: Ben comes to pick me up and started taking me to Texaco. Because I told him that's where im gonna get something at. Which I had to go to anyway to get me a redbull to get me something to drink. I didn't make no phone calls didn't try to do anything. I needed a ride to Texaco I didn't want to walk there and back. On the way to the Texaco he turned off and took a right. I asked him where we goin Texaco right there, we looking right at the store, and he turned back in the alley. And theres these 2 black people standing there, I knew one of them, tony I think that's his name. They're like hey ben wahts up whats' up? And bens like nothing. They are like You got any more of them Levi's ? Let me check those Levi's out.
Ben said yeah I got some. He got out of the car and took them out and started showing them
And the black guy that originally  ended up pullin the gun on me. started askin ben for a ride. Ben said I cant I cant I

*jpay Tell your friends and family to visit www.jpay.com to write letters and send money!*

HAROLD BUNCH 00586582 LSP Housing: J CUDA 4/R ID:218500628 [P 2/5]

You have received a **JPAY** letter, the fastest way to get mail

From : Carla M Sanderson,  CustomerID: 15051146
To  : HAROLD BUNCH, ID: 00586582
Date : 7/6/2016 3:33:02 PM EST,    Letter ID: 218500628
Location : LSP
Housing : J CUDA 4/R

gotta go. I gotta go man.
I was ready to get to the store and get home. I stepped out the car to walk to the store. I said alright man I'm just walking. The black guy said never mind never mind and he shut the door.
Cuz I was really thirsty. That was my plan.

KB: he shut the door?

JS: he opened the backdoor up for ben to show him the pants. Cuz ben stopped in the alley and I guess

KB: you was outside the car?

JS: Yes,  when we pulled up I was inside the car. That was their "excuse" to stop us. Hey ben you still got some of them levi pants. Ben said yeah sure and then just hopped out the car and opened the back door like it wasn't nothing and then the black guy started begging for a ride and I got tired of sitting there and I said alright ben im going, I gotta get to the store man. I stepped out of the car. When the black guy saw I was about to walk away he said never mind nevermind, like he didn't need a ride no more. I said all right. I sat back in the car and said all right ben I gotta go. About then I had a gun in my face. The black guy that was looking the jeans, had opened in the back door jumped in the car and pulled out a gun, told me to empty out my pockets. I reached in my pockets, I knew exactly where my money was. I had $35. I went straight for it I didn't play no games. Reached in my back pocket and threw him the $35. A twenty, a ten, and a five. He sat there screamin at me, I'm bout to kill you im about to kill you. He said empty out your pockets. I reached in my pockets and pulled my cell phone out and when I did that he started screaming and he said said woah woah woah, and he jammed that gun right inside my head there

KB: do you have a mark?

JS: i don't have no mark. He didn't smack me with it. Just enough to get my attention. That scared me. That had me all shaken up and wired. And I showed him my phone. I said here its just my phone its just my phone. And my phone is all cracked up as it is. I said its just my phone. I said you can search me, just search me. Just to put this on the record, this whole time, tony had nothing to do with it. He was outside keeping watch. So I cant say he had nothing to do with it. Tony acted like he didn't want to get in there and rob me because he had seen me before. When I sat down he come up because he was like 15 feet away from the car while the whole robbery was taken place, tony was. And then When I was like search me search me, pat me down, go through my pockets, I stepped out. The guy jumped up and he put the gun on top of the car and said hey you better not make a move. And he said, hey go search him and tony goes over there and said if you have anything just give it to him, if you got anything just give it to him, don't be stupid.  And I said I did I gave him my $35. And tony stuck his hands in my pockets. But I got the impression that tony really didn't want to do that. I'm not trying to be a cover for him because I don't like him at all. But the other guy was the main hostile robbery. Tony searching my pants I said that's it. And the guy who pointed the gun at me he said you take a hike.

KB: where was ben all this time?

JS: ben was standing right there in the drivers door not getting searched, not getting talked to, not getting asked if he had any money and ben was right there the whole time, just standing there sayin come on james give them your money give them everything. I was like ben I gave him everything I was just searched  from head to toe. The dude never pointed the gun at ben, never talked to ben, the whole time he pointed the gun at me. He said empty your pockets, holding this big old long brown revolver. It was really scary and when I was out the car he told me, you take a walk. He said ben you giving me a ride. Dude with the gun in the backseat and tony in the front seat. I was running away at the time. 10 15 feet up the road there was a used car shop, and I said there just robbed me, these two black guys just robbed me and they took this other guy with them. They said call 911. And I called 911.

KB: when ben followed u and asked u, how many pills did he ask you for? He said he had someone

JS: he said how many can you get your hands, you think you can get like 12-15 pills

KB: 12-15 ok. When you got in the car with ben and went to the store did you think ben had the impression that you had the pills on you?

**JPAY** Tell your friends and family to visit www.jpay.com to write letters and send money!

You have received a **jpay** letter, the fastest way to get mail

From : Carla M Sanderson, CustomerID: 15051146
To   : HAROLD BUNCH, ID: 00586582
Date : 7/6/2016 3:33:02 PM EST,   Letter ID: 218500628
Location : LSP
Housing : J CUDA 4/R

JS: I know he thought I had the pills on me.

KB: so your response when he asked you. You didn't tell ben that I had to go to Texaco to call someone to get them. Even tho you told me that earlier when you talked to ben you said, yeah I can get my hands on them. So when he picked you up, did he asked you do you have the pills?

JS: he never asked me nothing about it.

KB: ok but you didn't tell him you didn't have it

JS: I said I needed a ride to the store. Honestly I could have called NAME and gotten him over there and gotten him some pills. But when he first called me, he said hey do you have anything? And I said no I aint got nothing. He said, do you know where anything's at? I said I might be able to get my hands on something. I told him right then I didn't have nothing on me.

KB: how much time between the phone call and the time he picked you up?

JS: he said I'll be there in ten minutes

KB: when you got in the car with him what kind of conversation took place

JS: [unintelligible] levis. I said why you selling me levis. If you got a baggie pair of pants. Hes talking about the levis. Then you come behind us at the stop sign at sallys. He pulled out.

WB: did he pull out because I was behind ya'll?

JS: yeah

WB: and what did he say

JS: im nervous im nervous. I think he pulled that way so that when he pulled in the alley you wouldn't be no where around. Now that I think about it. Because he had it...I know he had it planned out to try to jack me. Because why would we have took that right turn. Why would we have turned down that alley.

WB: when you took that right turn did you say something

JS: yeah I was like wh?

WB: and what did he say?

JS: He went to turn around and I said where you goin, and he mumbled something. I don't remember exactly what he said. He was like yea yea aight. And we go in there and pulled up and as we were getting close to the black guys he said something about the laundry mat. We gotta go meet somebody at the laundry mat.

WB: and this took place behind the laundromat?

JS: in between the laundry mat, right past the car dealership. I think the laundromat is a little further up. But it was in between the laundromat and the used car shop.

WB: and these guys were standing out blocking the alley?

JS: they were standing in the middle of the road

WB: did they flag him or he just pulled up and stopped?

**jpay** Tell your friends and family to visit www.jpay.com to write letters and send money!

HAROLD BUNCH 00586582 LSP Housing: J CUDA 4/R  ID:218500628  [P 4/5]

You have received a **jpay** letter, the fastest way to get mail

From : Carla M Sanderson, CustomerID: 15051146
To   : HAROLD BUNCH, ID: 00586582
Date : 7/6/2016 3:33:02 PM EST,   Letter ID: 218500628
Location : LSP
Housing : J CUDA 4/R

JS: it was kind of the same time. Like ben had already pulled up and stopped and they walked up to the vehicle. Like maybe if ...ben coulda kept on going because they were on the side of the road. Ben pulled up and stopped and they just started talking like hey whats up man. Got any more of those levis for sale?

WB: So you think ben knew them?

JS: I know he knew them.

WB: you know one of the black guys tony, but the other, did you know him you ever seen him before?

JS: [shaking head] no

WB: what was he wearing?

JS: all I seen was the gun 11:39. Its all I was worried about. He had braids. I do believe. Im 99.9% sure that he did.

WB: what about his teeth?

JS: I don't know if he had gold in his teeth.

WB: any tattoos?

JS: nah I definitely cant tell you anything like that. I was scared. [unintelligible]

WB: you saw when tony and ben in the police department right. That tony is the tony you were talking about correct?

JS: yes

KB: the one that just walked out of here?

JS: yes. The whole time I was in there it seemed like, it seemed like he didn't want to get involved but he definitely wasn't doing nothing to stop it. He was there with the black guy, he was waiting there for us to get there. When we got there, the other guy come up, the guy with the gun come up talking to ben, soon as we pulled up, the guy with the gun talking to ben and tony just walked down the alley. I think he was lookin to see if that guy at the car dealership, I think he was watching for him. Now that I think about it I think he was watching for him too. Because when I got out that car and said I was just gonna walk, tony kinda like walked back up towards us a little bit, and the guy said allright never mind, shut the door  and went on and acting like. I got back in the car and he jumped in there with the gun and that's when It all took place. And when I got out the car the second time because he hit me in the head with the gun after I reached for my cell phone. I said its just my cell phone. I said pat me down. Search me just please just don't kill me. Search me. He was patting me down and I opened the door up. I don't know if he called tonys name out or not but he said hey search him. Tony reached in and checked my pockets. And that whole time he was mumbling in my ear just give him everything you got. I said I did tony. I just gave him $35 itsa ll I got on me.

WB: and then tony checked in your pockets?

JS: yeah, he lifted up my pants legs. My shirt, my shoes and everything.

WB: they checked your shoes and everything like that?

JS: yeah, and they told me, tony never said nothing about no pills or nothing. Neither one of them never mentioned nothing about no pills.

WB: when they told you to get going did you see tony get in the car with ben and the other guy?

JS: I didn't see him getting in but he was in the car. I took maybe 10 steps forward and turned around they were all

RECEIVED

JUN 19 2017

AO 241
(Rev. 01/15)    Legal Programs Department

SCANNED at LSP and Emailed
6/19/17 by CM . 132 pages
date        initials   No.

Page 1

## Petition for Relief From a Conviction or Sentence
## By a Person in State Custody

### (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

#### Instructions

1.  To use this form, you must be a person who is currently serving a sentence under a judgment against you in a state court. You are asking for relief from the conviction or the sentence. This form is your petition for relief.

2.  You may also use this form to challenge a state judgment that imposed a sentence to be served in the future, but you must fill in the name of the state where the judgment was entered. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file a motion under 28 U.S.C. § 2255 in the federal court that entered the judgment.

3.  Make sure the form is typed or neatly written.

4.  You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5.  Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6.  You must pay a fee of $5. If the fee is paid, your petition will be filed. If you cannot pay the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you. If your account exceeds $_____, you must pay the filing fee.

7.  In this petition, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different court (either in the same state or in different states), you must file a separate petition.

8.  When you have completed the form, send the original and _____ copies to the Clerk of the United States District Court at this address:

                    Clerk, United States District Court for
                    Address
                    City, State  Zip Code

    If you want a file-stamped copy of the petition, you must enclose an additional copy of the petition and ask the court to file-stamp it and return it to you.

9.  **CAUTION: You must include in this petition all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

10. **CAPITAL CASES: If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

RECEIVED

JUN 2 1 2017

Legal Programs Department

SCANNED at LSP and Emailed
6 21 17 by CM . 32 pages
date        initials   No.

# IN THE

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

ORIGINATING FROM:

TWENTY-SECOND JUDICIAL DISTRICT COURT
PARISH OF WASHINGTON
STATE OF LOUISIANA
DOCKET NO: 10-CR8-111246

**Harold Bunch**
*Petitioner*

VERSUS

**BURL CAIN, WARDEN**
**LA. STATE PENITENTIARY**
*Respondent*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPLICATION FOR FEDERAL HABEAS CORPUS RELIEF
WITH MEMORANDUM OF LAW IN SUPPORT AND
REQUEST FOR AN EVIDENTIARY HEARING

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HABEAS BRIEF FILED ON BEHALF OF
Harold Bunch, Jr. - PETITIONER

RESPECTFULLY SUBMITTED:

Harold Bunch, #586582
GENERAL DELIVERY
LA. STATE PENITENTIARY
ANGOLA, LA 70712

# IN THE
# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

Harold Bunch, Petitioner                       DOCKET NO.

VERSUS                                  FILED: _____

Darrel Vannoy, Warden
Louisiana State Penitentiary, ET AL.       _____
             Respondent(s)              CLERK OF COURT

## CHALLENGE AGAINST AN UNCONSTITUTIONAL ORDER FOR ILLEGAL CUSTODY
## FEDERAL HABEAS RELIEF WARRANTED

### PRESENTATION OF THE BRIEF:

NOW INTO THE COMES, **Harold Bunch**, petitioner hereinafter, before this Honorable United States District Court for the Eastern District of Louisiana challenging the state trial court's Judgements as to claims raised on behalf of petitioner during his direct appeal exhaustion process and the exhaustion of his post conviction remedies. Pursuant to the **5th, 6th, and 14th Amendments of the United States Constitution** and other law(s) set forth below, petitioner avers that his request for Post-Conviction Relief should have been granted by the trial court. In the alternative, testimony should have been taken on whether petitioner's application was immunized against procedural bars due to the substantive nature of the claims raised.

### PCR DECIDED ON PROCEDURAL GROUNDS; JUDGEMENT ERRONEOUS, UNDERLYING MERITS NOT REVIEWED ON DUE TO ERRONEOUS DECISION

1

Petitioner maintains that the procedural ruling of the trial court runs afoul of the Constitution and is worthy of further review by this court for correctness. A more relevant question is : "Whether the trial court, in the first instance has standing to invoke a procedural bar where both state appellate courts and the controlling Federal Circuit Court of Appeals has held the same procedural bars inapplicable to claims of incompetency. Petitioner avers that since he was mentally incompetent at the time of trial, and trial counsel ignored relevant evidence of petitioner's mental incapacity to proceed and incapacity during the period of the alleged offense:

> "The conviction against him was obtained in violation of the United
> States Constitution; Constitution of the State of Louisiana and the
> Louisiana Code of Criminal Procedure Article 930.3(1)."

Petitioner hereby avers that the he has been deprived of constitutional protections due to him, and the trial court sat in observation of these deprivations and now that these claims have been presented to the trial court for full consideration, the trial court has rejected the application of both State and Federal Constitutional Protections to this petitioner as one accused of a crime.

In an effort to present the evidence and facts in the direct appeal, post-conviction and illegal sentence motion contexts, petitioner took into consideration that fairness was due to the state and the court's option of affording the parties an evidentiary hearing so that the details of the claims could be further developed. In total contradiction of the controlling statutory provisions as well as the holdings in *Martinez v. Ryan* and *Trevino v. Thaler*, the trial court simply denied relief without a hearing and in wanton disregard for the actual intent and working of the post-conviction process.

The "facts" and "issues" presented to the trial court in the post-conviction warranted further development of the record prior to any final decision being rendered by the trial court. As a result of the trial court's denial, petitioner had no alternative other than to invoke the supervisory authority of the Honorable Appeals Court (state-level) to review cases which originate in it's circuit. It is the

2

belief of petitioner that the only way to ensure that the lower court record coming before the court would be adequate for federal habeas review is if orders were issued for a remand instruct the State Trial Court to conduct an evidentiary hearing on the claims presented with counsel being appointed to help this pro se litigant better perfect the claim so as to preserve the resources of the court and utilize available resources to the best of his/her client's benefit.

For the purpose of achieving the objectives of the State and Federal Constitution, it is requested that **petitioner be afforded all rights due him** pursuant to the *Constitution of the United States* and the *Louisiana Constitution of 1974.* Petitioner further invokes [with particularity] his procedural rights due pursuant *Louisiana Code of Criminal Procedure Article 924* et., e.g..., and his guarantee to *"Due Process"* and *"Equal Protection"* under the banner of the *Louisiana and United States Constitution.*

The petitioner, at present,  moves this Honorable Court to grant leave for supplementation and/or amendments to the application by the petitioner and/or the attorney appointed in this case pursuant the United States Supreme Court holding in *Martinez v. Ryan*, *Trevino v. Thaler*, and petitioner also invoked the provisions of *Louisiana Code of Civil Procedure Article 1151* before the state court forum.

## JURISDICTION

Upon a party exhausting their claims before the state court forum, at that point those claims have been fully adjudicated and become ripe for Federal Habeas review. *28 U.S.C. § 2254.* Pursuant *28 U.S.C. § 2244(d)(2) petitioner is timely because of the discovery of underlying facts previously not known,* and thereafter, petitioner promptly pursued relief in the state courts, wherein state-law contains exceptions to the state statute of limitations, just as the habeas statute does.  For the reasons set forth herein, though not adjudicated on the merits, petitioner furthers that he can and did show that

3

his PCR application, at the time it was presented to the state court forum, complied with the definition of being "**properly filed**" as clarified by the United States Supreme Court in *Artuz v. Bennett*, 121 S.Ct. 361, 531 U.S. 4, (U.S.N.Y. 2000).

Pursuant *2254(d)(2)*, The time during which a properly filed application for post-conviction or other collateral review with respect to the pertinent judgement or claim is pending shall not be counted toward any period of limitation under this subsection. Wherefore, if there is any question regarding this, petitioner seeks the opportunity to establish through facts and applicable case law, that he is timely in accord with the stated provisions of both state and federal law.

<h3 style="text-align:center">TIMELINESS OF APPLICATION</h3>

The claims raised herein fall in accordance with the statutory requirements of *§2254.*

### PROCEDURAL IMPLICATIONS - ROLE OF STATE POST CONVICTION

In theory, those convicted of crimes still have remedies even if their convictions have been affirmed on direct appeal. The writ of habeas corpus, originally preserved by the federal constitution has an analogous counterpart in every state constitution. The State Post-Conviction relief procedure reviews the legal errors that may have occurred at trial and allows for expansion of the record where the original transcript does not reflect potential constitutional error. Indeed, state post-conviction is often the first time a court hears claim of **ineffective assistance of counsel, prosecutorial misconduct, jury irregularity**, or facts discovered subsequent to or after trial that support the petitioner's conviction was obtained in violation of the Constitutions of the United States or Louisiana. Through time and custom, state post-conviction remedies are required to be brought to the state's court attention and exhausted before any federal habeas review will take place.

If this Court considers any of these claims procedurally defaulted prior to reaching the merits, this Court must find he (petitioner) was denied ineffective assistance of counsel on appeal. Further,

4

petitioner has also submitted his reasons through this pleading sufficient to warrant the relief requested and the appointment of counsel to help properly present the claim of ineffective assistance of trial counsel in this first direct-appeal on this particular claim (that would have been the initial post-conviction proceedings in this matter). However, when raised, petitioner was again denied his substantive and fundamental right to counsel in this initial post-conviction direct appeal of that claim. Therefore, this constituted a constructive denial of counsel at a critical stage in the proceedings (direct appeal of the ineffective-assistance of counsel claim) which cannot be overlooked.

Recognition of the combination of direct appeal and post-conviction claims of ineffective assistance of counsel claims was first fully explained in *Martinez v. Ryan*.    This dual/mixed pleading of a direct appeal and post-conviction claim(s) of the ineffective assistance of trial counsel claim/application for post conviction is sufficient to comply with the provisions of *La.C.Cr.P. art. 930.4F*.  Therefore, ineffective assistance on the part of appointed  trial counsel or appointed appellate counsel constitutes external objective factors created by the State.  Further, because these are causations which the state had control of, the state has to forego any/all procedural defenses because it is the author of the procedural default.  The state cannot withhold a substantive right, such as the right to counsel on direct-appeal of a claim, then argue that the petitioner failed to meet the threshold requirements of proving the claim when it denied him the means to do so.

As said many times over, by members of the judiciary, "the state is at fault for the deprivation and its effects." Beyond this, the state is unilaterally responsible for refusing to provide petitioner with counsel to assist in perfecting his claim of ineffective assistance of trial and appellate counsel, and the state is also responsible for having deliberately deprived petitioner of his substantive right to counsel when he attempted to perfect the claim of ineffective-assistance-of-counsel during the initial post-conviction/direct appeal proceeding wherein he would have perfected this claim and for these

5

counsels having failed to raise the violation of petitioner's rights when the composition of the indicting grand jury (meant guilt finding trial jury) composition was composed in violation of the mandates of law federal law.

## STATEMENT OF THE CASE

Petitioner and two co-defendants were charged by Bill of information with one (1) count of armed robbery and one count of possession of a firearm during the commission as a qualifier for an additional penalty. Petitioner pled not guilty, but was convicted, after a jury trial on both counts. Several post trial motions were filed (i.e. motion for new trial, motion in arrest of judgment, and for post-verdict judgement of acquittal. All such much motions were denied. On count one, a sentence of thirty years was imposed without benefits was imposed. On count two, an additional sentence of five years without benefits was imposed. Habitual offender proceedings were conducted and petitioner stipulated to being a second felony offender, both initial sentences were vacated and imposed a sentence of thirty-five years without the benefits of parole, probation, and suspension of sentence..

On February 22, 2013 the Fifth Circuit Court of Appeal affirmed defendant's convictions, habitual offender adjudication and sentence. *State of Louisiana v. Harold Bunch*, 2013 WL 675542 (La. App. 1 Cir. 2/22/13). Defendant timely filed a writ of certiorari in the Louisiana Supreme Court. The Supreme Court denied relief on October 11, 2013.

## FACTS OF THE CASE

On November 9, 2010, in Bogalusa, La, Tony Robertson and Wade Inzinna were driving around town when they began to discuss setting up "a lick," commonly known as a robbery. The two discusses the probability of robbing a man names James Singletary, whom both men knew. Prior to the commission of the robbery, the two men picked up a third person to facilitate the robbery.

6

It is the true identity of the third person which is the primary focus of this litigation, but there are other equally important issues. Once the intended victim was picked up, he was driven to a location behind a Laundromat as opposed to the convenience store at he had requested. Once behind the store it appeared as those their was going to be a sale of some stolen clothing. The sale did not pan out and the subsequent robbery of the victim James Singletary is the cause for this litigation, and this petitioner is challenging the fact that he was mistakenly chosen as one of the parties who participated in the robbery. The underlying facts will prove petitioner to not have been involved in this robbery and that the only reason he was selected as the third person was due to coercion of state witnesses and suggestive photographic line-up procedures.

## LAW AND ARGUMENTS

### PRO SE PLEADINGS ARE TO BE HELD TO LESS STRINGENT STANDARDS THAN FORMAL PLEADINGS DRAFTED BY LAWYERS

The law, as it is presently exists does not hold a pro se prisoner to the high standards in which

attorneys are held to. Further, the pro se prisoner is to be given the benefit of any favorable doubts

regarding his pleading, because he may suffer from an inability to articulate what is really wrong in

his case. Most importantly, this is how the United States Supreme Court addressed the issue in

*Haines v Kenner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972):

> "A pro se complaint, "however inartfully pleaded," must be held to
> "less stringent standards than formal pleadings drafted by lawyers"
> and can only be dismissed for failure to state a claim if it appears "
> 'beyond a reasonable doubt that the plaintiff can prove no set of facts
> in support of his claim which would entitle him to relief.'" Id., at 520-
> 52, 92 S.Ct. At 596, quoting Conley v. Gibson, 355 U.S. 41, 45-46,
> 78 S.Ct. 99, 2 L.Ed2d 80 (1957).

Under this settled-principle of law, this Honorable Court is duty-bound to permit the

development of the underlying facts of this case. Petitioner, **hereby invokes his right to be held to**

**a less stringent standard which provides that his pleading** "can only be dismissed for failure to

state a claim if it appears 'beyond a reasonable doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief.'" Plaintiff contends that precedent of the

United States Supreme Court regard pro se pleadings is binding. Any shortcomings represent in the

pleading present are the by-product of petitioner being forced to navigate these treacherous waters of

habeas litigation without the guiding hand of properly trained federal habeas counsel, as was the same

at the post-conviction/state-habeas level.

### CHALLENGE TO TRIAL COURT'S RULING

Petitioner urges that the trial court's ruling is reviewable de novo by this Honorable Court.

State v. Draughter, 130 So.2d 855 (La. 2013). Also, erroneous interpretations of the law is reviewed

de novo on appellate review <u>Domingue v. Bodin</u>, 996 So.2d 645 (La.App. 3rd Cir. 2008). When

reviewing questions of fact as determined by the fact finder, be it a jury or judge, appellate courts

utilize the manifest error or clearly wrong standard of review. <u>Sassone v. Doe</u>, 96 So.3d 1243 (La.

App. 4th Cir. 2012). Petitioner contends that the trial court's ruling in this instance suffers from both

deficiencies.

Petitioner challenges the trial court ruling as involving a decision which involves a clearly

erroneous determination of the fact, and abuse of discretion by not appointing counsel to aid in the

development and presentation of these claims.

## CLAIM NO. #1

**Ben's wife out of court statement got Mr. Bunch a warrant for his arrest because she told police officer that Mr. Bunch go by the street name "Mutha" and also, "Hot Boy". Ben Inzinnia's wife did not testify at Mr. Bunch's trial nor was there a written statement in open court, yet, the D.A. still used her statement at Mr. Bunch's trial and on Mr. Bunch's appellate brief. 6th Amendment and 14th Amendment.**

The petitioner contends that the trial court' ruling was erroneous, and this decision is

constitutionally unsound. Again the prosecutor puts the strength of judicial decision behind him to

drive home this hearsay testimony regarding what the wife of Ben Inzinnia supposedly told the

officers. The prosecutor once more urges upon the jury that behind the action of the officers is a

judicial decision (The issuance of a warrant) which upholds everything that he and the officers are

saying.

Petitioner has never been confronted with certain witnesses involved in the case, yet,

statements attributed to them have been used to convict him. This constitutes a "Classic Violation"

of the right to confrontation. <u>Everything concerning this incident came from a Detective who</u>

<u>admittedly narrated to the jury the stories of other witnesses and officers.</u> Trial Counsel failed to

protect the petitioner's ***6th Amendment right of confrontation*** (thus counsel was ineffective here

9

under Strickland v. Washington) This is true because counsel failed to require the cross examination of witnesses, and to compel attendance of witnesses, as found in Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1985), and failed to protect petitioner's rights as extended to similarly situated defendants (equal protections and due process).

It is a federal constitutional right of the constitution's *Sixth Amendment* for an accused to be confronted by the witnesses against the accused, thus, failure to grant an accused this right, would be a violation of the confrontation clause of the federal constitutions *Sixth Amendment*, under the federal criminal code and rules *"Rule 801"* An accused is entitled to have the witnesses against him testify under oath, in the presence of himself, and trier, subject to cross-examination; yet considerations of public policy and necessity require the recognition of such exceptions, as dying declarations and former testimony of witnesses. Mattox v. United States, 156 U.S. 237,15 S.Ct 337 (1895), Motes v. United States, 178 U.S. 458 20 S.Ct 993(1900). Delaney v. United States, 263 U.S. 586, 44 S.Ct 206 (1924).

Beginning with Snyder v. Massachusetts, 291 U.S. 97 54 S.Ct 330 (1934). The court began to speak of confrontation as a aspect of procedural Due Process, thus, extending it's applicability to state cases and to federal cases other than criminal. In the instant case, the petitioner contends that his *Sixth Amendment* right of confrontation was violated when the trial court permitted some officers to testify (as substitutes).

The right to confront and cross-examine is paramount under these circumstances, this right is clearly and unequivocally expressed in the unambiguous language of *La.C.Cr.P. art. 647* and cases such as Crawford, 541 U.S. 36 (2004), Davis v. Washington, 547 U.S. 813, 830 (2006), Melendez-Diaz, 557 U.S. _____ (2009) and White v. Illinois, 502 U.S. 346, 365 (1992).

10

## CLAIM NO. #2

Mr. Bunch did not get a fair trial.  Officer Kendall Bullen lied on the stand under oath Mr.
Bunch lawyer ask him did he ask the victim about gold teeth are tattoos his statement was no
it was not him ask that but the video tape show that the detective was telling a lie.  The tapes
show Mr. Detective Bullen face asking the victim Mr. Bunch was refused for jury to see the
video tape it proves that Mr. Bunch did not have a fair trial.

### ***REQUEST FOR DISCOVERY***

PETITIONER ASKS THAT THIS HONORABLE COURT GRANT HIM DISCOVERY AS TO
THIS CLAIM, AS PETITIONER NEEDS TO PRODUCE EITHER THE TRANSCRIPT OF
THE VIDEO OR THE VIDEO WHICH WOULD HAVE REVEALED MATERIAL
DISCREPANCIES IN SINGLETARY'S TESTIMONY

### KNOWING USE OF FALSE TESTIMONY

With respect to the foregoing claim, most recently, the federal judiciary has reaffirmed its

position demanding accountability for the known use of false testimony.  This was done in Robert

Tassin, Jr. v. Burl Cain, Warden, 07-70013, (decided February 14, 2008, U.S. Fifth Circuit) and

therein the fundamental protections set out in  Napue v. Illinois, 360 U.S. 264, 269, 79 S.CT. 1173,

1177, 3 L.Ed.2d 1217 (1959), (Government "may not knowingly use false evidence, including false

testimony") was thoroughly re-affirmed.

Petitioner's claim of the state's known use of False Testimony going before the jury was not

raised on direct appeal because there was no issue made of the matter during trial, and claims which

are not urged during the trial court proceedings or objected to "pursuant Louisiana's notorious

contemporaneous objection rule" cannot be availed on direct appeal.  Thus, this claim "requires a

merits determination"

A strict review of the trial court record reveals that the testimony of the state's witnesses,

along with the state's exhibit's, particularly the Officer Kendall Bullen lied on the stand under oath

Mr. Bunch's defense attorney asked Officer Bullen did he question victim about gold teeth or tattoos,

11

the officer's response under oath was "NO" he was not the one who asked that, however, there was a video tape their and in court which would prove this testimony to be false, however the video was not allowed to be played to that the "false testimony" could be relied upon by the trial jury in determining guilt ore innocence of the accused. The video tape shows Detective Bullen's face while he asked the victim, "Does Mr. Bunch have Gold Teeth or Tattoos?"

<h3 align="center">CLAIM NO. #3</h3>

**D.A. lies to the jury about the video tape when Mr. Bunch lawyer ask. The judge to play the tape D.A. stated was he did not have nothing to play it on. Mr. Bunch lawyer stated well I see a T.V. and DVD player right there. Mr. Bunch rights were violated as a constitutional matter.**

Again in the case of Robert Tassin, Jr. v. Burl Cain, Warden, 07-70013, (decided February 14, 2008, U.S. Fifth Circuit), the fundamental protections set out in Napue v. Illinois, 360 U.S. 264, 269, 79 S.CT. 1173, 1177, 3 L.Ed.2d 1217 (1959), (Government "may not knowingly use false evidence, including false testimony") were thoroughly re-affirmed. This D.A. while acting under his personal Oath of Office as provided for in *La. Const. Art. X, § 30*, made a material false statement of fact.

Petitioner's asserts that the prosecutor committed "prosecutorial misconduct" prejudicial to the administration of justice when he deliberately and knowingly made the false statement of material fact that, as to the video evidence, he had nothing to play it on for the jury to watch. Defense counsel objected and declared the matter right there before the court and the court said that if would not let the jury see the tape. Thus, the court itself actually partook in the deprivation of petitioners constitutional rights afforded him by the Constitution of the United States. This claim of the state's known use of False Testimony (because the prosecutor was actually indirectly testifying before the jury) and he is under oath at all times in his active duties), this was not raised on direct appeal because there was no issue made of the matter during trial, and claims which are not urged during the trial court

12

proceedings or objected to[1] "pursuant Louisiana's notorious contemporaneous objection rule" cannot be availed on direct appeal. Thus, this claim, "requires a merits determination" as well

> The United States Supreme Court has long ago established that it is the prosecutor's duty to refrain from improper conduct in the course of a criminal prosecution. Berger v. United States, 295 U.S. 78, 55 S.CT. 629, 79 L.Ed.2d 1314 (1935). However, prosecutorial misconduct violates the constitutional rights of an accused if it either infringes upon a specific constitutional right or so infects the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. Dechristoforo, 477 U.S. 637, 643, 94 S.CT. 1868, 40 L.Ed.2d 431 91974); in accord with Darden v. Wainwright, 477 U.S. 168, 182, 106 S.CT. 2464, 91 L.Ed.2d 144 (1986), even if a prosecutor misconduct does not infringe upon a specific constitutional right it can still violate the due process clause of the United States Constitution by rendering the underlying trial "fundamentally unfair", Darden, 477 U.S. 182-183, 106 S.CT. 2464.

In this case, the petitioner contends that prosecutorial misconduct violated his *Fourteenth Amendment* right to due process.

### CLAIM NO. #4

**Detective Wendell O'Berry lied on the stand under oath when he stated Ben said Mr. Bunch had 4 tear drop video shows Ben did not say what Detective Wendell O'Berry stated. Then Mr. Wendell stated Ben said, "Mr. Bunch had what's next on his eye-lids, Ben stated on video tape**

---

[1]According to the trial court, this matter was objected to, however, that was missed by petitioner, again, if this is in fact the case, it is a matter of petitioner being a lay-person as recognized by the state trial court, whom, despite this acknowledgment, still failed to appoint counsel to assist in this litigation and the development of t he underlying claims. And, since the trial court found that it was sufficiently preserved, then, it was appellate counsel who was responsible for the failure to timely and properly litigate the claim before the appellate court, as that was appellate counsel's duty to bring into litigation those claims which trial counsel for so wronged his client, that he had to preserve those issues for appellate review. And according to the trial court, appellate counsel failed to do this. This could have been "hashed out" had the state trial court afforded petitioner the appointment of counsel and an evidentiary hearing on the issues raised.

13

he had" who next" what's next is not what he said, the video tape can prove everything as to how Mr. Bunch was rail-roaded. And the court's refusing the defense an opportunity to show the video to the jury to see the video proving this deprived petitioner of his right to a defense.

The trial court, during petitioner's post-conviction litigation proclaims that the trial judge did not restrict counsel from Playing Inzinnia's incriminating statements about Bunch, but that trial counsel never sought to. The problem here, is that though seemingly incriminating, it would be and has been in many cases established that when an alleged witness (eye-witness) has missed "glaring and obvious distinctive markings on a suspect, those facts are sufficient to call into questioning the reliability of that identification. Here, in his ineffectiveness, trial counsel clearly failed in his duty owed to the client and it may have been because the presiding judge had denied every challenge made by counsel. Had an evidentiary hearing been afforded at the state court level, we counsel have learned and went into the details of counsel's lapses and what role the trial court may have played in them. As the trial court noted on page 8 of its ruling,

> "The jury heard the testimony of all individuals connected with the crime and reviewed all of the photos used for identification. They chose to reject the eleventh hour testimony of Inzinnia <u>who admitted to perjuring himself</u> whether at trial or during the initial investigation."

Under these circumstances, we are not at liberty to say that the perjured testimony of Inzinnia in no way affected the finding of the jury. The jury could have believed some of Inzinnia's perjured testimony and rejected other portions of it. Either way, it was there to have an affect on the jury's finding and there was no correcting/correction of the perjured testimony by the prosecution.

With respect to the foregoing claim, most recently, the federal judiciary has reaffirmed its position demanding accountability for the known use of false testimony. This was done in <u>Robert Tassin, Jr. v. Burl Cain</u>, Warden, 07-70013, (decided February 14, 2008, U.S. Fifth Circuit) and therein the fundamental protections set out in <u>Napue v. Illinois</u>, 360 U.S. 264, 269, 79 S.CT. 1173,

14

1177, 3 L.Ed.2d 1217 (1959), (Government "may not knowingly use false evidence, including false testimony") was thoroughly re-affirmed.     The constitutional protections pursuant the *14th Amendment* and the *Sixth Amendment* require that the State of Louisiana not knowingly solicit false testimony for the purposes of securing a conviction, nor can the State of Louisiana allow known false testimony to go uncorrected.   To do so impugns the accused right to a defense and it further perverts the truth seeking function of the trial mechanism.

Petitioner's claim of the state's known use of False Testimony going before the jury was not raised on direct appeal because there was no issue made of the matter during trial, and claims which are not urged during the trial court proceedings or objected to "pursuant Louisiana's notorious contemporaneous objection rule" cannot be availed on direct appeal. Thus, this claim "requires a merits determination"

A strict review of the trial court record reveals that the testimony of the state's witnesses, along with the state's exhibit's, particularly the Detective Wendell O'Berry lied on the stand under oath Mr. Bunch lawyer defense attorney asked Detective Wendell O'Berry did he question victim about tattoos on his eyelids, the officer's response under oath was that the Ben Inzinna said Mr. Bunch had "what's next" on his eyelids  Detective Wendell O'Berry lied on the stand under oath when he stated Ben said, "Mr. Bunch had 4 tear drops" in his face. However, the video shows Ben did not say what Detective Wendell O'Berry stated. Then Mr. Wendell stated Ben said, "Mr. Bunch had "what's next" on his eye-lids, Ben stated on video tape that Mr. Bunch had "who next." Thus, the video shows that "what's next" is not what he said, the video tape can prove how Mr. Bunch has been rail-roaded.   Although readily available to prove this testimony to be false; the video was not allowed to be played to that the "false testimony" could be relied upon by the trial jury in determining

15

guilt or innocence of the accused. The video tape shows Detective Wendell O'Berry face while he

asked the victim, "Does Mr. Bunch have Tattoos on his eye-lids or in his face?"

### CLAIM NO. #5

**Mr. Bunch, line up was a suggestive line up it shows 6 photos Mr. Bunch #5 everybody head on it was big like a basket ball Mr. Bunch head was like a seed. And that's a suggestive line up The trial court erred by failing to grant Defendant motion to suppress the identification because the identification was improperly and unconstitutionally suggestive.**

Your petitioner herein maintains that photo-graphic array which was presented to the witness

was unduly suggestive. State v. Johnson, 461 So.2d 673, 674 (La.App. 1 Cir. 1984). All the suspects

in the line-up shown in this case had very large head or they where magnified and re-copied, yet,

petitioner's head and photograph was made to look small in due comparison, thereby drawing direct

attention to his photograph.

Where the key issue is the defendant's identity as the perpetrator, rather than whether or not

the crime was committed, the state is required to negate any reasonable probability of

misidentification. State v. Richardson, 459 So.2d 31, 38 (La.App. Cir. 1984). Positive identification

by only one witness may be sufficient to support the defendant's conviction. State v. Royal, 527 So.2d

1083, 1086 (La.App. 1 Cir.) *writ denied*, 533 So.2d 15 (La.1988). Single photograph identifications

should be viewed in general with suspicion. State v. Harper, 646 So.2d 338, 341 (La.1994). An

identification is unduly suggestive if during the procedure, a witness's attention is focused on the

defendant. State v. Hawkins, 572 So.2d 108, 112 (La.App. Cir. 1990).

With regard to in-court identifications, the standard to be used for determination of

admissibility is whether, under the totality of the circumstances, the suggestive identification

procedure led to a substantial likelihood of irreparable misidentification. With the deletion of the

word "irreparable," the standard serves as well for admissibility of testimony concerning out- of-

court identifications. Neil v. Biggers, 409 U.S. 188, 196, 93 S.CT. 375, 381, 34 L.Ed.2d 410 (1972).

16

In <u>Manson v. Brathwaite</u>, 432 U.S. 98, 97 S.CT. 2243, 53 L.Ed.2d 140 (1977). In *Manson*,

the court considered these five factors in determining whether the identification was suggestive: *(1)*

the witness's opportunity to view the defendant at the time the crime was committed; *(2)* the degree

of attention paid by the witness during the commission of the crime; *(3)* the accuracy of any prior

description; *(4)* the level of the witness's certainty displayed at the time of identification; and *(5)* the

length of time elapsed between the crime and the identification.

Applying the *Manson* factors to the present case it is easy to find that the identification

procedure did produce the likelihood of misidentification.

## CLAIM NO. #6

**Victim Mr. James stated in police report he did not know the third person, he explained that he
never seen him before, not a day of his life. Also, he knew nothing about gold teeth or tattoos.
And the robbery occurred in the day time and the sun was out. Mr. Bunch has a face full of
tattoos, in addition to the multiple gold teeth in this mouth. The picture the victim picked out
on the line was Mr. Bunch. Mr. Bunch was 20 years old in that picture and had no tattoos in his
face and no braids in his head. Additionally, the victim did not sign and date the back of Mr.
Bunch photo. And when the officer asked Mr. James did the person who robbed you have gold
teeth or tattoos he stated "No, he did not." and he said he was positive of that. The video tape
has one story the police report has another story and at the time of trial, the was a great deal
of deception and story changing. For this reason, the refusal to allow the video to be played,
constituted the deprivation of the right to a defense and a fair trial. Mr. Bunch is now in prison
for something he did not do. In trial the victim said, "I am a 100% sure that's the guy, I don't
no nothing about no tattoos or gold teeth." He also said, "I can't forget Mr. Bunch eye-balls.
Noticeably, there is nothing significant about Mr. Bunch's eyes. There are no distinguishing
traits about them, the only significant thing is that he has the tattoos by his eyes. The video
shows everything, Mr. Bunch is innocent and did not rob Mr. James.**

Mr. Bunch contends that he has been denied all the fundamental protections of an accused as

set forth by the ***Constitution of the United States***. Despite it's sovereignty, a state is not at liberty

to just arrest and incarcerate an innocent person for a Crime someone else has committed, especially

when there is sufficient proof that the innocence of the accused is paramount.

All across America, innocent people are languishing in prison, Louisiana is leading the charge

with innocent people incarcerated. And here we are again where the State of Louisiana seeks to

17

maintain the incarceration of yet another innocent victim. The state of Louisiana bought testimony in return for lenient sentences and this all occurred at the expense of petitioner. Declarations of innocence Immunize a post-conviction proceeding against procedural bars and the same is invoked herein. Petitioner has a *Sixth* and *Fourteenth Amendment* right to the protection of his rights by the presiding Judge, the Prosecutor (dual-responsibility) and his defense attorney. When the justice system fails an innocent person and deprives him of his freedom unjustly, society is injured in addition to the injury imposed upon the innocent victim. At a minimum, counsel would have or should have brought in some witnesses who knew the defendant and could have testified about how long petitioner has had his tattoos and what distinguishes him from other people. (Strickland v. Washington violation) had counsel called in some witnesses on his client's behalf, surely, the jury could have easily been swayed to return a different verdict. Had counsel specifically asked the jury to look at the accused and determine for themselves what is most memorable about his appearance when they looked away, surely it would have been his facial tattoos, however this viable tactic was not use by counsel.

## CLAIM NO. #7

**Mr. Bunch lawyer at sentence hearing Mr. Lawyer told the courts on record. That he had committed ineffective assistance of counsel for leaving a family member and juror on Mr. Bunch's, trial jury after she stated that she knew the victim.**

Please note petitioner acknowledging that typographical errors appear in the original Memorandum of Law submitted to the trial court.[2] Despite these typos, had petitioner been afforded to the protective measure of counsel as envisioned by Martinez v. Ryan and Trevino v. Thaler, all such

---

[2] Petitioner having read back over his pleadings acknowledges that in those sentences where the term "Grand Jury" appeared, that should have read "trial jury" and where the term indictment was mentioned, it should have been "bill of information". Despite these two typographical errors, there was a sufficient factual basis submitted for the court to decipher the proper context of the claim and if any confusing arose, the court was empowered to give petitioner notice of the need for any clarification to ensure that all claims were given there requisite constitutional review.

errors could have been removed and this matter properly reviewed by the trial court..It is a

deprivation of one's right to a fair trial and impartial jury when a defense attorney knowingly allows

a party specifically interested in the outcome of a case to remain on the jury. The Federal

Jurisprudence which currently controls this grey area of law does not address the questions urges by

the instant petitioner. The primary case often relied upon to resolve similar matters is United States

v. Mechanik, 475 U.S. 66, 70 106 S.CT. 938, 941-42, 89 L.Ed.2d 50 (1986) in which the Supreme

Court held that:

> "A subsequent conviction on an indictment made harmless the error of having two
> witnesses testify before a grand jury simultaneously, we stated that while a grand
> jury's function is to prevent a defendant from having to defend against a crime for
> which there is no probable cause, **a petit jury's guilty verdict establishes both
> probable cause and guilt.** " Porter, 805 F.2d at 941.

It should be noted that the aim of the creation of the Grand Jury was protection to protect

citizens from Royal tyranny, unfounded accusations and harassment, the purpose of the petit or trial

jury is to determine "guilt" or "innocence". The final goal was to remove undue influence or the

arraignment on charges being brought by interested persons charges that may be unwarranted. The

more suitable case which could be applied to the instant set of facts is the standard articulated by Hon.

Justice O'Connor in Bank of Nova Scotia v. United States, 487 U.S. 250, 254 108 S.CT. 2369 2373,

101 L.Ed.2d 228 (1988) was free from the substantial influence of such violations. The trial jury is

supposed to function in much the same way. The trial jury is supposed to be a check and balance

against the automation of the imposition of punishment and the declaration of one being deemed guilty

of unsustainable charges.

Here, the petitioner's case went to the trial jury whereby the prosecutor had urged that the

defendant committed one of the most heinous crime.

19

Through stratagem, pure ineffectiveness on part of the defense counsel and pure stratagem on part of the prosecutor. This is tantamount to **Trail Jury Fixing or Rigging against the accused**. At the time the Trial jury took up this case, the prosecutor knew the following:

> 1.) that there was one vote towards the guilt/prosecution with no effort of persuasion or presentation of evidence or witnesses testimony being presented.

> 2.) That the prosecution had someone on the Trial Jury who could relay to the remaining Jurors inside information garnered from sources beyond the trial mechanism which did not come from the testifying witnesses or the evidence presented.

> 3.) The Trial[3] Jury process was thwarted from functioning as a tool of Administering Justice. Instead, the Trial Jury became a tool of vengeance and opportunity for the parties who gave false testimony against the accused. And it became another notch on the belt for the prosecution.

Although it may be alleged that bias in this instance can only be speculated, petitioner contends that as long as there exists room to indulge in this speculation, the Trial Jury Process as applied to the instant case is unconstitutional. Furthermore there are facts here to consider:

---

[3]There was a previous typographical error where throughout the pleading, "Grand" instead of "Trial" jury was mentioned, but that was amended for correction in the course of litigation.

1.) Ms. Louise Jackson[4] was on the Trial Jury which convicted petitioner.

2.) Negative motive or intent can be inferred on part of defense counsel as there was no advantage or tactical reason to allow the person to remain.

3.) The silence of the prosecutor shows: a will to win at all costs

4.) Lastly, the court, defense attorney and prosecution permitted the trial to proceed when it was obvious that there was manipulation of the constitutionally legal process due to Mr. Bunch.

In addition to the foregoing reasons highlighting the unconstitutionality of this practice, the District Attorney knew that the evidence did not support the conviction of this innocent individual. As a reflection of this the prosecutor circumvented the mandate of a 10-2 verdict in this case, the prosecutor only needed to earn nine (9) votes not ten (10) as one vote was his at the start of trial. This denied the petitioner a state and Federally required fair trial, due process and equal protection of the law.

In going beyond the aforementioned, the unanimity among the decisions rendered on the Constitutional Challenge of "Infiltration of the Trial Jury by a Biased Party" hinges upon the contention that a guilty verdict on the charge set forth in the indictment establishes that either there was no jury

---

[4]

If this name (Ms. Louise Jackson) proves to be error, then such an error was clearly subject to amendment had the trial court appeal licensed experience counsel. Long before anyone chose to cut back on prisoner access to courts, some courts had expressed the opinion that even a complete library would not provide the inmate with much chance of success: "In this court's view, access to the fullest law library anywhere is a useless and meaningless gesture in terms of the great mass of prisoners. The bulk and complexity [of the legal issues] have grown to such an extent that even experienced lawyers cannot function efficiently today without the support of special [research] tools . . . . To expect untrained laymen to work with entirely unfamiliar books whose contends they cannot understand, may be worthy of Lewis Carroll, but hardly satisfies the substance of the constitutional duty of [access to courts]. Access to full law libraries makes about as much sense as furnishing medical services through books like: "Brain Surgery Self Taught", or "How to remove your own Appendix", along with scalpels, drills, hemostats, sponges and sutures." *Falzerano v. Collier*, 535 F.Supp. 800, 803 (D.N.J. 1982)

21

bias or alternatively that the jury bias was harmless because the guilty verdict which came thereafter established that he/she would have been found guilty anyway.

In the absence of the appointment of counsel committed to a post-conviction litigants rights, the presentation and adjudication of the claims cannot be deemed reliable nor trustworthy,[5] especially if it involves the claim of ineffective assistance of trial counsel or as in this instance, the actions of trial counsel wherein no explanation for counsel's action or failure to act is called in legal question. **This is especially true where there was no further factual development beyond what the trial court had before it**. A remand and appointment of counsel is definitely warranted in this instance. Why? Because *Martinez* teaches that, when ineffective-assistance of trial counsel claims are not raised on appeal and are subsequently deferred into the post-conviction collateral proceeding that is the first time that the merits of the claim will be addressed, then counsel "must" be appointed to represent the petitioner on that issue. And certainly, trial attorney cannot be asked to go back to the record and find evidence of himself being ineffective during the prior proceedings. **Having the effective assistance of counsel on one's first appeal is a matter of right.[6]** For failing to make

---

[5]

If a prisoner were given the LSAT and failed, he should not be allowed to represent himself on post-conviction, and that is precisely what he is expected to do. Truth must be recognized in the fact that depressive symptom's alone (i.e. reduced concentration, reduced energy, reduced initiative, interpersonal withdrawal, feelings of apathy and hopelessness, various somatic complaints and loss of perspective) could have a profound impact on the inmate's ability to represent himself. And before the post-conviction process is started, how many prisoners are tested to find out if their IQ tests would fall in the range of mental retardation? Under the present conditions, there is no hope that a prison inmate, on a large scale basis, would be able to deal with any legal complex issue(s) however expansive their opportunity might be to do research. Notably, their are no institutional lawyers to assist in the preparation of any of these pleadings.

[6]

Also, it is necessary to note that some years ago, the Law Libraries throughout D.O.C. had Westlaw online, due to a accidental firewall breach, some inmates accessed some information not appreciated by the department. Since that time all inmate have been made to suffer in their access to material in their efforts to continue the litigation of their cases. The inmates are given access to Westlaw though a quarterly update system. As a matter of routine, this system is rarely, if ever up-to-date with cases

certain that counsel acted with the aim of protecting his client's best interests, **the state constructively deprived appellant/plaintiff the fundamental and substantive right to have the guiding hand of counsel at a "critical stage" in the proceedings**.[7] (*U.S. v. Cronic*, violation).

This rationale has been rejected in every other area of law save this one, **In law, the ends does not justify the means by which that end is achieved**. Why? Because the means provides the mode by which to arrive at "just ends." As such the accused contends that he is entitled to the nullification of the conviction secured against him and he demand the right to a fair trial, with a n impartial jury and the effective assistance of counsel so that he cane establish his "actual innocence.

In this case, even the trial Judges December 2, 2014, Judgement rendered in this case, shows "WHY?" why it was so critical for the instant petitioner to have the guiding hand of counsel when the ruling judge wrote:

> "As typically the case in pro se pleadings, the court is faced with the
> very difficult task of deciphering the legal arguments of an individual

---

decided within the last ninety (90) days. As a general rule, the system is six to 12 months behind and the opposition (state) has up to the moment access. This too contributes to the reality of why: requiring a prisoner to litigate post-conviction without appointing counsel is a fundamental denial. Long before anyone chose to cut back on prisoner access to courts, some courts had expressed the opinion that even a complete library would not provide the inmate with much chance of success: "In this court's view, access to the fullest law library anywhere is a useless and meaningless gesture in terms of the great mass of prisoners. The bulk and complexity [of the legal issues] have grown to such an extent that even experienced lawyers cannot function efficiently today without the support of special [research] tools . . . . To expect untrained laymen to work with entirely unfamiliar books whose contends they cannot understand, may be worthy of Lewis Carroll, but hardly satisfies the substance of the constitutional duty of [access to courts]. Access to full law libraries makes about as much sense as furnishing medical services through books like: "Brain Surgery Self Taught", or "How to remove your own Appendix", along with scalpels, drills, hemostats, sponges and sutures." *Falzerano v. Collier*, 535 F.Supp. 800, 803 (D.N.J. 1982)

[7] With all due respect to the judge in *Falzerano*, the better analogy would be to provide inmate-surgeon with medical books on how to do surgery, but deny him the use of scalpel, a well-lit room, and chemicals for sterilization of the patients wounds. This is so because the existing process for the inmate-litigant denies him any chance to do investigation [t]he most critical component of properly presenting any application for post-conviction relief.

23

> who is generally not formally educated in the law and often times, not well educated by the public school system. Judge Parro writing for the First circuit in State ex rel. Lay v. Cain, 691 So.2d 135, 96-1247 (La. App. 1 Cir. 2/14/97) described this task as "Sometimes as easy as catching a greased snake with your bare hands." However, while that take might be well nigh impossible, courts are duty bound to grant leeway to inartful pleadings in order to carry out justice."

From this perspective, it can be seen that the petitioner should have been appointed counsel to assist him in his litigation of the issues presented. Particularly, where the petition made reference to the grand jury, it is inherent that this untrained lay person meant trial jury. So for that error, petitioner is apologetic as he continues to try and grasp what all these legal terms mean and their immediate significance as applicable to him and his situation as it moves forth.

## CONCLUSION

Petitioner concludes by stating that he has made the requisite showing under to his entitlement to Federal Habeas Relief. Petitioner has met his burden of proof under *§2254* that his claims contain constitutional violations to support the nullification of convictions and sentence as they have been obtained in violation of the United States Constitution.

Wherefore, petitioner prays that this court vacate his unconstitutional convictions, sentence, and order for his continued custody and remand the matter to the trial court for a new trial, or order an Evidentiary Hearing, and appoint counsel to settle the allegations set forth above.

RESPECTFULLY SUBMITTED:

Harold Bunch #586582
CBA U/R #9
LA. STATE PENITENTIARY
ANGOLA, LA 70712

24

## CERTIFICATE OF SERVICE

I, Harold Bunch #586582, hereby certify that I have forwarded a copy of the above proceedings to the District Attorney's Office for the Parish of Washington on this _1 5_ day of _6 − 18_ 2017.

Harold Bunch
Harold Bunch

25

**TABLE OF CONTENTS**

CHALLENGE AGAINST AN UNCONSTITUTIONAL ORDER
    FOR ILLEGAL CUSTODY FEDERAL HABEAS RELIEF WARRANTED .........1

PCR DECIDED ON PROCEDURAL GROUNDS; JUDGEMENT
    ERRONEOUS, UNDERLYING MERITS NOT REVIEWED ON DUE TO ERRONEOUS
    DECISION .........................................................1

JURISDICTION ...........................................................3

TIMELINESS OF APPLICATION ...............................................4

PROCEDURAL IMPLICATIONS - ROLE OF STATE POST CONVICTION ..............4

STATEMENT OF THE CASE ..................................................6

FACTS OF THE CASE ......................................................6

LAW AND ARGUMENTS .....................................................8

    PRO SE PLEADINGS ARE TO BE HELD TO LESS STRINGENT STANDARDS
        THAN FORMAL PLEADINGS DRAFTED BY LAWYERS ...............8

    CHALLENGE TO TRIAL COURT'S RULING ...............................8

CLAIM NO. #1 ...........................................................9

    Ben's wife out of court statement got Mr. Bunch a warrant for his arrest because she told
        police officer that Mr. Bunch go by the street name Mutha and also, Hot Boy. Ben In
        zinnia's wife did not testify at Mr. Bunch trial nor was there a written statement in
        open court and the D.A. still used her statement in Mr. Bunch's trial and on Mr.
        Bunch's appellate brief. 6th Amendment and 14th Amendment..............9

CLAIM NO. #2 ..........................................................11

    Mr. Bunch did not get a fair trial. Officer Kendall Bullen lied on the stand under oath Mr.
        Bunch lawyer ask him did he ask the victim about gold teeth are tattoos his statement
        was no it was not him ask that but the video tape show that the detective was telling
        a lie. The tapes show Mr. Detective Bullen face asking the victim Mr. Bunch was
        refused for jury to see the video tape it proves that Mr. Bunch did not have a fair trial
        ..................................................................11

KNOWING USE OF FALSE TESTIMONY ...................................11

i

CLAIM NO. #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

 D.A. lies to the jury about the video tape when Mr. Bunch lawyer ask.  The judge to play the
  tape D.A. stated was he did not have nothing to play it on.  Mr. Bunch lawyer stated
  well I see a T.V. and DVD player right there.  Mr. Bunch rights were violated as a
  constitutional matter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CLAIM NO. #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

 Detective Wendell O'Berry lied on the stand under oath when he stated Ben said Mr. Bunch
  had 4 tear drop video shows Ben did not say what Detective Wendell O'Berry stated.
  Then Mr. Wendell stated Ben said, "Mr. Bunch had what's next on his eye-lids, Ben
  stated on video tape he had" who next" what's next is not what he said, the video tape
  can prove everything as to how Mr. Bunch was rail-roaded.  And the court's refusing
  the defense an opportunity to show the video to the jury to see the video proving this
  deprived petitioner of his right to a defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CLAIM NO. #5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

 Mr. Bunch, line up was a suggestive line up it shows 6 photos Mr. Bunch #5 everybody head
  on it was big like a basket ball Mr. Bunch head was like a seed.  And that's a
  suggestive line up The trial court erred by failing to grant Defendant motion to
  suppress the identification because the identification was improperly and
  unconstitutionally suggestive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CLAIM NO. #6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

 Victim Mr. James stated in police report he did not know the third person, he explained that
  he never seen him before, not a day of his life.  Also, he knew nothing about gold teeth
  or tattoos.  And the robbery occurred in the day time and the sun was out.  Mr. Bunch
  has a face full of tattoos, in addition to the multiple gold teeth in this mouth.  The
  picture the victim picked out on the line was Mr. Bunch.  Mr. Bunch was 20 years old
  in that picture and had no tattoos in his face and no braids in his head.  Additionally,
  the victim did not sign and date the back of Mr. Bunch photo.  And when the officer
  asked Mr. James did the person who robbed you have gold teeth or tattoos he stated
  "No, he did not." and he said he was positive of that.  The video tape has one story the
  police report has another story and at the time of trial, the was a great deal of
  deception and story changing.  For this reason, the refusal to allow the video to be
  played, constituted the deprivation of the right to a defense and a fair trial.  Mr. Bunch
  is now in prison for something he did not do.  In trial the victim said, "I am a 100%
  sure that's the guy, I don't no nothing about no tattoos or gold teeth."  He also said, "I
  can't forget Mr. Bunch eye-balls.  Noticeably, there is nothing significant about Mr.
  Bunch's eyes.  There are no distinguishing traits about them, the only significant thing
  is that he has the tattoos by his eyes.  The video shows everything, Mr. Bunch is
  innocent and did not rob Mr. James. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CLAIM NO. #7 ................................................... 18

    Mr. Bunch lawyer at sentence hearing Mr. Lawyer told the courts on record. That he had
    committed ineffective assistance of counsel for leaving a family member and juror on
    Mr. Bunch's, trial jury after she stated that she knew the victim. ............ 18

CONCLUSION ................................................... 24

CERTIFICATE OF SERVICE ................................................... 25

## TABLE OF AUTHORITIES

**Federal Constitution**

5th, 6th, and 14th amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . 1

6th Amendment right of confrontation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Constitution of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 18

Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 18

State Constitution

La. Const. Art. X, § 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Louisiana Constitution of 1974 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Federal and State Statutes**

924-930.8 of the Louisiana Code of Criminal Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

La.C.Cr.P. art. 647 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

La.C.Cr.P. art. 930.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

La.C.Cr.P. art. 930.4F . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Louisiana Code of Civil Procedure Article 1151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Louisiana Code of Criminal Procedure Article 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Louisiana Code of Criminal Procedure Article 930.3(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rule 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Federal and State Cases**

Bank of Nova Scotia v. United States, 487 U.S. 250, 254 108 S.CT. 2369 2373, 101 L.Ed.2d 228
(1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Berger v. United States, 295 U.S. 78, 55 S.CT. 629, 79 L.Ed.2d 1314 (1935) . . . . . . . . . . . . . 13

iv

Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed2d 80 (1957) . . . . . . . . . . . . . . . . . 8

Crawford, 541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Darden v. Wainwright, 477 U.S. 168, 182, 106 S.CT. 2464, 91 L.Ed.2d 144 (1986) . . . . . . . . . 13

Davis v. Washington, 547 U.S. 813, 830 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Delaney v. United States, 263 U.S. 586, 44 S.Ct 206 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Domingue v. Bodin, 996 So.2d 645 (La.App. 3rd Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Donnelly v. Dechristoforo, 477 U.S. 637, 643, 94 S.CT. 1868, 40 L.Ed.2d 431 91974) . . . . . . . 13

Falzerano v. Collier, 535 F.Supp. 800, 803 (D.N.J. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Haines v Kenner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) . . . . . . . . . . . . . . . . . . . . . 8

Manson v. Brathwaite, 432 U.S. 98, 97 S.CT. 2243, 53 L.Ed.2d 140 (1977) . . . . . . . . . . . . . . . 17

Martinez v. Ryan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 18

Mattox v. United States, 156 U.S. 237,15 S.Ct 337 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Melendez-Diaz, 557 U.S. _____ (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Motes v. United States, 178 U.S. 458 20 S.Ct 993(1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Napue v. Illinois, 360 U.S. 264, 269, 79 S.CT. 1173, 1177, 3 L.Ed.2d 1217 (1959) . . . . . . 11, 14

Neil v. Biggers, 409 U.S. 188, 196, 93 S.CT. 375, 381, 34 L.Ed.2d 410 (1972) . . . . . . . . . . . . . 16

Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1985) . . . . . . . . . . . . . . . . . . . 10

Robert Tassin, Jr. v. Burl Cain, Warden, 07-70013, (decided February 14, 2008, U.S. Fifth Circuit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

Sassone v. Doe, 96 So.3d 1243 (La. App. 4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Snyder v. Massachusetts, 291 U.S. 97 54 S.Ct 330 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

State v. Draughter, 130 So.2d 855 (La. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

State v. Harper, 646 So.2d 338, 341 (La.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

State v. Hawkins, 572 So.2d 108, 112 (La.App. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

State v. Johnson, 461 So.2d 673, 674 (La.App. 1 Cir. 1984) ............................ 16

State v. Richardson, 459 So.2d 31, 38 (La.App. Cir. 1984) ............................ 16

State v. Royal, 527 So.2d 1083, 1086 (La.App. 1 Cir.) *writ denied*, 533 So.2d 15 (La.1988) . . . 16

Strickland v. Washington ................................................... 10, 18

Trevino v. Thaler ........................................................ 3, 18

U.S. v. Cronic .............................................................. 23

United States v. Mechanik, 475 U.S. 66, 70 106 S.CT. 938, 941-42, 89 L.Ed.2d 50 (1986) . . . . 19

White v. Illinois, 502 U.S. 346, 365 (1992) ...................................... 10



**Angola E-Filing**
Angola E-Filing   to:  efile-prose@laed.uscourts.gov

06/21/2017 10:34 AM

1 attachment

DOC #586582.pdf

RECEIVED

JUN 2 1 2017

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk